On petition for reconsideration of motion to dismiss appeal, filed May 24. Former order dismissing appeal withdrawn. Motion for reconsideration allowed and motion to dismiss denied June 19, 1963. Argued May 5, affirmed November 25, petition for rehearing denied December 22, 1964

## UNITED STATES NATIONAL BANK *v.* UNDERWRITERS AT LLOYD'S, LONDON ET AL

382 P. 2d 851
396 P. 2d 765

Phillips, Coughlin, Buell & Phillips, Portland, Koerner, Young, McColloch & Dezendorf, and James H. Clarke, Portland, for the petition.

Before McAllister, Chief Justice, and Rossman, Perry, Sloan, O'Connell, Goodwin and Denecke, Justices.

SLOAN, J.

■ This case is here on a motion to dismiss the appeal because the filing fee was not paid to the county clerk within the time allowed for the filing of notice of appeal. When the motion to dismiss was first presented it was allowed because of the decision in *Citron v. Hazeltine,* 1961, 227 Or 330, 361 P2d 1011. A motion for reconsideration has been filed. A majority of the court, for the reasons hereinafter stated, believe that the *Citron* case should be overruled.

In the instant case, counsel for appellant forwarded the notice of appeal and other documents from Portland to the county clerk of Sherman county. He failed to include a check for the filing fee. The next day the attorney called the clerk to make certain the notice of appeal had been received and filed. The clerk notified him that it had been. Nothing was said about the fee. Two days later, when the clerk was preparing to forward the papers to the clerk of this court, she noticed that the fee had not been received. She called the attorney and notified him of the lack of the fee. He inquired if it would be satisfactory for him to mail a check. The clerk stated that it would be for it was her practice to merely endorse the check and forward

to the clerk of this court. It arrived after the last date had expired upon which a notice of appeal could have been filed.

Chapter 27, Oregon Laws 1963, now provides a statutory declaration that the payment of the filing fee is not jurisdictional. To that extent the legislature has overturned the *Citron* decision. However, we are equally concerned about other aspects of the *Citron* decision. The obvious effect of the *Citron* case upon other functions of the county clerks leads us to believe that its overturn is inevitable. As indicated, the legislative reversal does no more than provide that the payment of a filing fee for the filing of a notice of appeal is not jurisdictional. It does not overrule the effect of the *Citron* case that any document filed with the clerk for which the filing is not paid is a nullity. A literal reading of the *Citron* case can produce no other conclusion.

It is said that if such a hard and fast rule were not adhered to that the county clerk would be converted to a collection agency and required to devote much time to collecting unpaid fees. A review of the statutory scheme in respect to all fees collected by the clerk, and to prior decisions of this court will dispel that motion.

Prior to 1895 the statute specified a fee to be charged by the clerk for each act he performed in respect to the filing of an action and the trial thereof. See 2, Hill's Annotated Laws of Oregon (2d ed 1892) § 2339. The clerk kept the fees paid as his compensation as clerk. In 1895, the legislature placed all clerks and certain other county officers, on a salary basis. The act enumerated the fees that were to be collected by the clerk. The fees were no longer to be the property

of the clerk but the property of the county. Oregon Laws, 1895, page 77, § 8, of that act specified the filing fees required to be paid for the filing of various acts and provided, "* * * and such paper shall not be deemed filed unless such payment is made; * * *." The latter requirement has been retained since that date. ORS 21.110. Section 10 of the 1895 Act provided that the clerk's salary should be withheld if he filed a document without collecting the fee or neglected his duty in any other respect; "* * * until the matter is fully rectified." That provision too has been carried forward. ORS 205.360. Therefore, the legislature protected the public funds by placing personal responsibility on the clerk. Reference to the statutes make it clear that when and by whom the fees are paid was and is not material. If the clerk failed to collect, he paid. This aspect of the case will be referred to later.

The specification and collection of fees by the clerk of the supreme court was the same. 2, Hill's Annotated Laws of Oregon, (2d ed 1892) § 2338. In 1899 the clerk of the supreme court was also placed upon a salary basis and a fixed filing fee provided for filing an appeal in this court. Oregon Laws, 1899, § 1, page 167. The act provided that the fee should be "in advance." The payment of fees on appeal remained substantially the same until the general revision of the appellate code in 1959. ORS 19.035 now governs the payment of fees for appeal. It reads:

"(1) At the time the notice of appeal is filed with the clerk as provided in ORS 19.023, the appellant shall deposit with the clerk the amount of the Supreme Court filing fee.

"(2) Within 10 days after a notice of appeal has been filed the clerk shall send to the Clerk of the Supreme Court, at Salem, a certified copy of the

notice of appeal and the appellant's Supreme Court filing fee."

Emphasis is made that ORS 21.010 to 21.050 respecting fees to be paid to the clerk of this court contained no provisions similar to that above mentioned compelling the county clerks to be personally responsible for the collection of fees. It is now important to see what the court has done with these statutes.

The first cases decided after the 1899 change in the filing fee requirement merely held that the fee could not be waived. *Therkelsen v. Therkelsen,* 1899, 35 Or 75, 78, 54 P 885, 57 P 373. In 1903 came *Hilts v. Hilts,* 43 Or 162, 72 P 697. In *Hilts* it was held that if the filing of the fee is a prerequisite to the filing of a transcript on appeal to this court then no filing is accomplished unless the fee has been paid. *Hilts* has been held controlling in two later cases of *Hart v. Prather,* 1912, 61 Or 7, 119 P 489, and *Citron v. Hazeltine, supra,* 227 Or at 334. There is one other case that has considered this statute, *Templeton v. Lloyd,* 1911, 59 Or 52, 109 P 1119, 115 P 1068. This was one of two cases bearing the same name and consolidated on appeal. A transcript was filed in both cases but only one fee was paid. In answer to a motion to dismiss because of the failure to pay the fees in one of the cases the court gave this short answer: "* * * and apparently, on account of the transcripts in the two cases of the same name being filed at the same time, some delay was caused in the payment of fees. This has been corrected." The motion to dismiss was denied. This case has significance by reason of the action taken. In the motion to dismiss, found in the files of this court, respondent had relied on *Hilts v. Hilts, supra,* in support of the motion. We do not know, of course, what

prompted the court, in view of its earlier *Hilts* decision, to so summarily dispose of this motion to dismiss. The records of this court disclose that, as indicated in the quoted portion of the opinion, that the omission was corrected by a late payment of the filing fee.

The facts and authorities cited in the *Hilts* case deprive it of the significance attached to the case in the two later decisions. Particularly when applied to the present statute, above quoted, for the payment of fees on appeal to this court and in respect to the facts of the instant case. In *Hilts* the transcript (required by the then appellate procedure) was sent by the appellant, to the deputy clerk of this court at Pendleton. The required fee did not accompany the document. The deputy clerk did not file the transcript. The fee was later paid, after the expiration of the time for filing. The court held that because the statute required the payment of the fee "in advance" that no filing could be accomplished until the fee was paid.

In the *Hilts* opinion the court quoted at length from *The State v. The Chicago & Eastern Illinois Railroad Company et al,* 1896, 145 Ind 229, 43 NE 226. The Indiana case did no more than decide that an official can and should refuse to file documents until the prescribed fees are paid. In the Indiana case an attorney took to the Secretary of State of Indiana papers involving the consolidation of certain railroads. A statute of that state required the filing of such papers and provided that the "* * * Secretary of State shall neither file nor record * * *" such papers until the specified fees were first paid. In this instance the papers were tendered to the Secretary of State for filing. The Secretary determined that the statutory filing fee would be $25,000. The attorney, who had tendered the papers, not being prepared to pay so

large a fee, withdrew the papers and took them away. The State of Indiana then filed the action to collect the fee on the basis of the tender for filing. The court denied recovery on the basis that the Secretary had properly refused to file them when the fee was not forthcoming. That is all that the case held. The case did not, and could not have ruled on the collectability of the fee if the official had filed the papers absent on immediate payment of the fee.

The *Hilts* opinion also cites *Pinders v. Yager,* 1870, 29 Ia 468. The later case says little that is of consequence to the problem at hand.

It is fair to say, accordingly, that when the *Hilts* case is stripped to the essentials it actually holds that a receiving official may and should deny any filing until any prescribed fee has been paid. The same is true in *Hart v. Prather, supra,* 61 Or 7. That case involved an appeal from the county court to the circuit court. And, although the clerk of the circuit court had received the necessary transcript on appeal, he did not file it until the time for filing had expired. In *Hart* the filing was also governed by the statute relating to county clerks, above referred to, which specifically said a document shall not be deemed to have been filed until the fee had been paid.

In addition to the *Templeton v. Lloyd* case, supra, 59 Or at 55, this court has considered one other case in which the document in question was actually filed but the fee not paid. That is *Spaulding Log Co. v. Ryckman,* 1932, 139 Or 230, 6 P2d 25. It would appear that the *Spaulding* case provides a workable and sound solution to the troublesome question mentioned at the outset of this opinion. That is: What is the status of a document actually received and filed or recorded for which the fee was not paid? To continue to hold that

such a filing is a nullity, as would be the result in the Citron case, *supra,* 227 Or 330, could provoke unnecessary challenge as to the validity of any document filed by the clerk without the payment of the filing fee.

In the *Spaulding* case, the county clerk had received and filed a claim of lien but had failed to collect the required filing fee. It was claimed that the filing was, therefore, a nullity. This court held that when the lien claim was presented for filing the clerk should have refused to have filed it until the fee was paid. But having filed the same the clerk, by reasons of the statute, became personally liable for the fee and that the filing was valid. Such a ruling protects the filed document and the recovery of public funds. The county clerk should refuse to file any document unaccompanied by the fee. But if he does act then the clerk, by statute, is responsible for the fee and the amount thereof deducted from his salary.

The opinion in the *Spaulding* case distinguishes both *Hilts v. Hilts, supra,* and *Hart v. Prather, supra,* on the valid ground that both cases involved different statutes. They also can be distinguished because they presented different facts and different problems.

*Citron v. Hazeltine, supra,* 227 Or at 334, distinguishes the *Spaulding* case and clings to the *Hilts* and *Hart* cases. If our appellate procedure had not been changed in 1959, and if the filing fee were still required to be paid, "in advance" to the clerk of this court, and if the statute had not been amended to provide that only the timely filing of the notice of appeal was jurisdictional (ORS 19.033 (2) ) then the decision in the *Citron* case could more nearly be sustained. But the 1959 amendments did radically change the fee paying schedule to this court.

The statute in respect to the payment of the fee to

the county clerk and the transmittal of the fee to the clerk of this court has been before set forth. It is now the burden of the county clerk. When the notice of appeal was tendered to the clerk in the instant case she should not have filed the notice until she received the fee. But she did. Whether she collected the fee or not it was due in this court 10 days later. It would be up to the county clerk to forward the fee here whether she had collected it from the appellant or not. The fee would have to have been paid here regardless. As so clearly indicated by the facts in this case, the county clerk is only a transmittal agent to forward the fee to this court. The only deadline specified by the statute is the payment to the clerk here. No part of the fee remains with the county clerk. The fee is not paid for any function performed by the county clerk. This is a distinct difference to the former practice when the fee was paid directly to the clerk of this court.

■■ The importance of the adoption of such a rule in respect to the numerous documents that are to be filed with the county clerk cannot be overemphasized. The rule here proposed protects the clerk, for the filing sans a fee can be rejected. It protects the public fund for there is an immediate remedy at hand for the collection of the fee. The statutes can be said to intend that the solution to an unpaid filing fee is not to vitiate the document but to collect the fee from the clerk. The statutes, as before mentioned, indicate that the purpose is to collect the fee, not to govern the validity of documents and that time of payment is secondary to actual payment.

Former order dismissing appeal withdrawn. Motion for reconsideration allowed and motion to dismiss denied.

McALLISTER, C. J., dissenting.

This appeal was dismissed because of the failure of the appellants to deposit with the county clerk the Supreme Court filing fee within the time allowed for filing a notice of appeal. ORS 19.035. Appellants filed a petition for rehearing which was denied. The matter is before us now on what is in effect a second petition for rehearing.

In my opinion *Citron v. Hazeltine,* 227 Or 330, 361 P2d 1011, was correctly decided and is controlling here. I would adhere to our order dismissing the appeal.

ROSSMAN and PERRY, JJ., join in this dissent.

**ON THE MERITS**

*James K. Buell,* Portland, argued the cause for appellants. With him on the briefs were H. H. Phillips and Phillips, Coughlin, Buell & Phillips, Portland.

*Roger L. Dick,* The Dalles, argued the cause for respondent. On the brief were Dick & Dick, The Dalles.

Before McAllister, Chief Justice, and Rossman, Perry, Sloan, O'Connell, Goodwin and Denecke, Justices.

O'CONNELL, J.

This is an action to recover $100,000 under a certificate of accidental death insurance issued by the defendants. The insured died of a gunshot wound. Defendants appeal from a judgment entered on a verdict for plaintiff, the executor of the insured.

The issue at trial was whether the insured, Marion Mark Powell, died as a result of accidental bodily injury or as a result of suicide. Defendants' principal

contention on appeal is that there was not sufficient evidence to support a verdict of accidental death and that, therefore, the court erred in denying their motion for a directed verdict.

We are of the opinion that the evidence supporting plaintiff's theory of the case was sufficient to justify submitting the case to the jury.

Powell, the insured, was a resident of Moro, Sherman County, Oregon, where he owned and operated a large wheat ranch. He was 49 years of age at the time of his death. He died as a result of a head wound inflicted by the discharge of a 30.06 Remington rifle while he was alone in a spare sleeping room in the basement of his home. The evidence showed that the bullet first penetrated the lower lip, blew away a part of the hard palate just behind the upper front teeth, proceeded through the left maxillary bone, the left eye, the tip of the frontal lobe of the brain and finally out through the upper part of the forehead. There was evidence of the path of the bullet on a portion of the bedstead and on the cement wall directly behind the head of the bed. When Powell's wife found him he was on his back in bed. The rifle was leaning against the bed with the muzzle resting on the floor.

Defendants' contention is summarized in the following statement taken from their brief:

"The undisputed physical facts proved by plaintiff show that Mr. Powell was flat on his back in bed with the rifle muzzle against or in his mouth at the time the gun was fired; that the path of the bullet was parallel to the body, through the roof of the mouth, out through the left eye, into the temple, out of the skull, ticking the vertical metal strut in the head of the bed and into the cement wall parallel to his body and directly in line with

the position of his head on the bed. These undisputed physical facts overcome the presumption against suicide as a matter of law. How else could it have happened?"

Plaintiff points to the following circumstances which could explain to the jury's satisfaction the wounding as an accident rather than as an attempted suicide:

(1) Mr. Stanley McDonald, a ballistics expert, testified that in his opinion Powell did not shoot himself intentionally. He drew this conclusion from the character of the wound and the absence of a visible soot pattern on Powell's face.[1] He testified that tests made with Powell's rifle showed that the muzzle end of the gun would have to be more than 12 inches away before a soot pattern would not be visible. He further testified that if the muzzle of the gun had been in Powell's mouth at the time of discharge the explosive force of the expanding gas would have "entirely blown

[1] Dr. Skirving, who attended Powell immediately after the shooting, testified as follows:

"Q Did you look to determine whether there was a soot pattern on the face of Mr. Powell?

"A We did, and we looked specifically, because at first we thought it would be obvious, and when we didn't find any we looked very carefully, as we were curious, and there was none any place that we could determine, any powder burns or soot pattern."

On cross-examination he testified:

"Q Doctor, you have already mentioned that you did not find any soot pattern, although you carefully looked. Did you find any flash burn?

"A There was none evidenced. By that I assume you intend to mean the searing by the flash itself?

"Q Yes; and you did not find that?

"A I did not find any.

"Q Did you look?

"A I certainly did."

off" a large portion of Powell's head. According to McDonald's analysis of the situation, considering the character of the wound and the absence of a soot pattern, the length of the rifle barrel, the length of Powell's arm, and other measurements, the only way Powell could have intentionally shot himself would have been by the use of a mechanical device such as a stick or string attached to activate the trigger. There was no evidence of any instrumentality of this kind in the room in which Powell was found.

(2) Although defendants assume that Powell was on his back in bed when the gun went off, plaintiff argues that the wound could have been inflicted while Powell was sitting on the bed with his feet on the floor or in some other position. In fact, since Powell was still living after he was wounded, it is possible that he could have been wounded while he was in a part of the room some distance from the bed and that he found his way to the bed after being wounded. However, this possibility is remote because the marks made by the bullet show that it passed in a trajectory nearly horizontal to the bed which would indicate quite clearly that Powell was on his back or in a prone position when struck by the bullet. But even if it is assumed that Powell was in the position described by defendants, plaintiff would still be entitled to get to the jury if it is not irrational to assume that Powell could have been in such a position while handling the rifle for some purpose other than killing himself, i.e., for the purpose of cleaning it, adjusting some part of the mechanism or the like. Gun accidents happen in all kinds of unusual circumstances. It does not seem reasonable to say that simply because Powell may have been stretched out in bed with a gun that no

reasonable jury could conclude that he could have had any object in mind other than the taking of his own life.

(3) When Powell was found he was clutching a cigarette lighter in his right hand. He was right handed. If defendants' version of the facts is accepted, this appears to be a one-handed suicide, or at best a clumsy two-handed one. The jury could have believed that one bent on suicide would have gone about it with a little more efficiency. It would have been inconvenient, it would seem, for Powell to get the barrel of the gun up to his mouth and pull the trigger while one hand was occupied with a cigarette lighter. He could have pressed the trigger or held the gun barrel with his right hand even with the cigarette lighter in it or he could have activated the trigger with his toe. It seems more likely, however, that if Powell had decided to take his own life he would have done it in a less complicated manner. At least the jury could have so concluded.

(4) There was evidence that the rifle involved in this case had gone off accidentally on another occasion. A witness who had been on a hunting trip with Powell testified as follows:

"* * * He and I went hunting in his new pickup on my ranch. * * * [H]e had two clips, and one of them had no shells in it, and the other had shells; and he put the clip in with no shells, and the gun refused to unlock or do anything. He took it out from the pickup—in fact we had spotted some deer. He was about to shoot and discovered he couldn't. He took it out of the pickup and he couldn't unlock it. He beat it up and down with the butt on the ground, and to get the clip out he had to put it over the bumper of the pickup and force that latch. Well, a couple of hours later we

run across another bunch of deer. We lost that bunch; and he had always put that gun in the pickup on the floor this way (indicating), and I didn't like that pointing at me, so I asked him to put it in pointing the other way. We ran across another bunch of deer, and I stopped the pickup. I was driving, and he went to jump out and the damned— the gun went off as he was getting out the door and I didn't exactly see if it was in his hand yet or if he was still pulling it, because I was watching the deer. It happened right here.

"Q Where was he when the gun went off?

"A He was just getting out the door, either that or on the ground, I am not sure which, I was astounded at the gun going off so quick. It was an accidental firing and he swore at the gun and says, 'The damned thing could hurt somebody.' "

It is not impossible that on the day Powell was wounded he made a similar effort to remedy some defect in the rifle and in doing so caused it to fire. A witness testified that Powell frequently did not unload his gun when he brought it home after hunting.

(5) The jury could justifiably have made something of the fact that the gun was leaning against the bed and was not on it (as it might well have been if it was held in line with Powell's body when discharged). Similarly, Powell's glasses and dentures were found on the floor rather than on the bed which could suggest that Powell may not have been in the position described by defendants.

(6) There was evidence negating a motive for suicide. The jury could have concluded from the evidence that Powell was in good financial condition, healthy, in good spirits, not unhappily married, not moody or morose, and generally interested in the day to day affairs of life.

██ The foregoing summary presents a view of the evidence most favorable to plaintiff. This is not to suggest that there was not evidence tending to support defendants' position.[2] However, plaintiff is entitled to our evaluation of the facts in a light most favorable to its contention.[3] We hold that when the evidence is so viewed there was sufficient evidence to support the jury's conclusion that Powell's death resulted from an accidental injury.

█ The defendants' fifth assignment of error attacks the following instruction to which exeception was duly taken:

"I instruct you that the law never presumes that one accused of committing a suicide is guilty thereof. The presumption is against suicide. It is presumed that a person accused of doing a wrongful act is innocent of such accusation. Such a presumption is the equivalent of evidence and the plaintiff is entitled to its benefit throughout the trial of this case and throughout your deliberations on the facts until such time, if ever, as sufficient evidence may satisfy your minds to the contrary. It is therefore presumed that the gunshot wounds received by the deceased Marion M. Powell were the result of an accident and were not intentionally self-inflicted. If you find that the gunshot wounds caused the death of Marion Powell then, unless the presumption against suicide has been overcome by

---

[2] There was evidence, for example, tending to establish the following: That the front sight of the gun contained bits of Powell's nasal hair; that Powell's dentures and glasses contained traces of nitrates; that the 30.06 Remington rifle was not the rifle which had misfired on the previous occasion; that the 30.06 Remington rifle was, in fact, in sound, safe mechanical condition; that Powell had experienced marital difficulties, although not recently; that disease may have worked subtle, but incurable, changes in his personality and emotional control.

[3] Copenhagen, Inc. v. Kramer et ux, 224 Or 535, 356 P2d 1064 (1960).

sufficient evidence to satisfy you, it is presumed that Marion M. Powell's death was the result of an accidental bodily injury and was not the result of suicide. Generally, if you find that Powell's injury and death were accidental, plaintiff is entitled to recover. If you find that Powell intentionally shot himself, resulting in his death, the defendant should recover."

Defendants contend that it was erroneous to state that it is "presumed" that the gunshot wounds "were the result of an accident and were not intentionally inflicted." It is argued that this instruction gives recognition to a presumption of accidental death and that there is no such presumption. There is a presumption against suicide, it is conceded, but this presumption, defendants argue, does not "breed another presumption that the death was accidental." Although the presumption against suicide cannot, in every case, be stated in terms of a presumption of accidental death,[⊕] we are unable to see any difference in the manner of expressing the presumption (i.e., in terms of accident or suicide) if the sole issue is, as it was in the present case, whether death resulted from accident or suicide. We find no error in this part of the instruction.

It is further argued that the reference in the in-

---

[⊕] See Anno., 12 ALR2d 1264, 1269 (1950), where the conditions precedent to the existence of an affirmative presumption of accidental death are set forth. See also, Pan-American Life Ins. Co. v. American Industrial Inv. Co., 207 SW2d 173 (Tex Civ App 1947), holding that no affirmative presumption arises where the policy provides that plaintiff must establish that the death of the insured was caused by external, violent and accidental means, except in instances where the defense is suicide. Compare Seater v. Penn. Mut. Life Ins. Co., 176 Or 542, 571-76, 156 P2d 386, 159 P2d 826 (1945), holding that no affirmative presumption of accidental death exists where evidence indicates probability that physical or mental ailments caused death.

struction to a presumption of accidental death had the effect of shifting the burden of proof to defendants. This criticism has prompted us to re-examine the character of the presumption against suicide and the manner in which the jury is to be instructed with respect to it. In *Wyckoff v. Mutual Life Insurance Co. of New York,* 173 Or 592, 147 P2d 227 (1944) we held that although the presumption against suicide is not evidence in the strict sense, it has "evidentiary value" and an instruction revealing the evidentiary quality of the presumption must be given.

As Professor Morgan has pointed out in his comment in 23 Or L Rev 269, 272 (1944) on *Wyckoff v. Mutual Life Insurance Co.,* supra, strictly speaking a presumption itself is not evidence. However, the facts upon which a presumption is based may be treated as evidence. The instruction commonly given in Oregon referring to a presumption as evidence may be justified as an elliptical way of saying that the facts upon which the presumption is based are to be treated as evidence. However, unless the instructions go on and explain the basis for the presumption, the jury is not likely to understand the ellipsis. We shall point out later how this explanation should be made to the jury.

■ The presumption against suicide is a presumption based upon a "fact" that has probative value. The "fact" is not formally adduced as evidence, but is derived from the generally accepted assumption, judicially noticed, that there is a human revulsion against suicide. From this psychological fact it is assumed that when a violent death is shown to have occurred and the evidence does not establish the cause of death as suicide or accident, it is more probable than not

that death resulted from an accident. Stated statistically, it is assumed that of all the violent deaths which occur the greater number result from accidents rather than suicide.

██ The jury should be informed that it is entitled to use this generality as a basis for reasoning that, since there is a normal human revulsion against suicide generally, the deceased in the particular case before it also experienced the revulsion and, therefore, did not take his own life. The jury should be told that the presumption expresses a *generality* only, i.e., that humans do not *ordinarily* take their own lives. The presumption does not purport to describe the state of mind of all persons in every circumstance. In the particular case before it the jury is free to conclude from the evidence adduced that the deceased overcame the normal revulsion against suicide.

There is a preliminary question of whether we should even recognize the existence of a presumption against suicide in the present case. In his dissent Mr. Justice GOODWIN questions the validity of a so-called presumption against suicide. This criticism of the presumption against suicide, at least as applied to cases of death by gunshot wounds, has been expressed elsewhere, including the article by White, Presumptions in Violent Death Cases or Quo Vadis Presumption?, 15 U Miami L Rev 1 (1960) relied upon by the dissent.[9] The critics of the presumption rely upon statistics showing that a majority of deaths resulting from gunshot wounds not inflicted by third persons

---

[9] See also Hartman, The Presumption Against Suicide as Applied in Insurance Cases, 19 Marq L Rev 20 (1934); Breyfogle and Richardson, Problems of Proof in Distinguishing Suicide From Accident, 56 Yale L J 482 (1947).

are motivated by suicide.⑥ On the basis of these statistics it is contended that a presumption against suicide should not be recognized where death occurs under such circumstances.⑦

The suggestion that the presumption against suicide be abolished in these circumstances does not appeal to us. Assuming that the statistics accurately represent the percentages of death by accident and suicide, it will seldom be clear where a particular case falls within the fact-grouping upon which the statistics are based. Where death results from wounds not inflicted by another person, the circumstances may vary considerably as to the place, motive, and other indicia, sometimes pointing to suicide and sometimes pointing to accident. If the facts point more strongly to accident than suicide, certainly there is no reason why the plaintiff should not be entitled to have the benefit of the presumption simply because the case falls *generally* into the category constituting the basis for the statistics. The trial judge, and eventually the appellate court, would be confronted with the task of deciding in each case whether or not the facts justified

---

⑥ E.g., Statistics taken from the public records of the Vital Statistics Section of the Oregon State Board of Health show that in 1962, of 157 firearm deaths (excluding homicides), 127 were attributable to suicides. In 1961, there were 110 suicides out of 132 firearm deaths; in 1960 the proportion was 129 out of 147.

⑦ On this reasoning the presumption would be discarded in *any* factual situation where statistics would establish a probability of suicide (e.g., death as a result of carbon monoxide gas poisoning, etc.). And the reasoning would carry us still further and require us to carve out of all presumptions which are based upon probability the factual groupings where statistics judicially noticed run counter to the probability upon which the presumption is based. Moreover, consistency would require the recognition of a presumption in accord with the probability revealed by the statistics. Thus in the present case the jury should be informed that there is a presumption of suicide rather than a presumption against it.

the recognition of the presumption. It is preferable to recognize the presumption, informing the jury that it is merely a broad generalization as to human reaction to suicide, and permit the opponent to weaken or destroy the inference by showing that in the facts of the particular case the evidence points the other way.[9]

■ Those who would reject the presumption against suicide in the case of self-inflicted gunshot wounds rely upon statistics taken from the public records. It is quite probable that one could rummage through other records and find data running counter to many other presumptions based upon a general probability. When are we permitted to assume that these statistics are trustworthy? Obviously the statistics represent purely hearsay statements. Moreover, the raw statistics do not tell us what data was used in making the tabulation separating cases of suicide from cases of accident. This court is divided on the question of whether there is evidence to support a verdict of suicide in the present case. How does the Board of Health classify the present case? It could be classified either way, depending upon whether one accepts the view

---

[9] Perhaps the rules of evidence should be extended to permit the defendant to introduce statistical data showing that the probability of suicide is greater where death results from wounds imposed by an instrumentality in the insured's own hands. If it can be argued that such statistics may be relied upon to abolish the presumption (thus used by the court as "legislative" facts), it is at least equally arguable that they should be admissible as evidentiary facts. So used, they would permit the jury rather than the court to destroy the presumption by applying the statistical probability rather than the general probability derived from all cases of violent death. Cf. Joseph v. W. H. Groves Latter-Day Saints Hospital, 10 Utah2d 94, 348 P2d 935 (1960) (statistical evidence held to prevent inference of negligence from arising); Note, The Use of Expert Evidence in Res Ipsa Loquitur Cases, 106 U Pa L Rev 731 (1958).

taken by the jury or the view taken by the dissent in this case. Until the matter is fully adjudicated the case must be placed in a third category of unclassified cases. But the public statistics make only two classifications which do not reveal how the doubtful cases are resolved for the purposes of the classification.[9] It is our conclusion that the presumption against suicide is applicable to the facts of the present case and that the jury should be made aware of the existence of the presumption.[10]

We turn, then, to a consideration of defendant's contention that the instruction as to the effect of the presumption constituted error. The trial court first instructed the jury that "The plaintiff has the burden throughout this case of proving this accidental injury by a preponderance—or a greater weight—of the evidence." Thereafter, the instruction relating to the presumption against suicide, set out above, was given. The latter instruction is in the form endorsed in the

---

[9] It may be assumed that in many cases classified by the Board of Health the cause of death could be quite clearly established either as accidental or suicidal. Thus in one case a suicide note is found; in another the circumstances clearly show some mishap causing the death. How can a tabulation of such occurrences, based upon evidence clearly showing the cause of death, be helpful in cases such as the present where there is no comparable evidence? If, out of 100 cases classified as suicide, there were 75 cases in which a suicide note was left, the tabulation would mean little or nothing in a case such as we have here where no note or any other indicia clearly points to suicide. Similarly, were it shown that a significant proportion of the listed suicides occurred while a gun barrel was within the decedent's mouth, the statistics would be of small importance here where the bullet entered through the decedent's lower lip.

[10] Mr. Justice Goodwin, although rejecting the presumption against suicide, states that he would have no objection to a jury being instructed as the majority says it should have been instructed. It is difficult to see how *any* instruction could be given on the meaning of the presumption if the presumption itself is to be rejected.

*Wyckoff* case. Attention is called to the part of the instruction which states that "unless the presumption against suicide has been overcome by sufficient evidence to satisfy you, it is presumed that Marion M. Powell's death was the result of an accidental * * * injury and was not the result of suicide." This is tantamount to saying that the defendant has the burden of proof, on the issue of suicide or accident, which, of course, would contradict the previous instruction to the effect that plaintiff has the burden of proving death by accident. The contradiction in this manner of instructing the jury is pointed out by Professor Morgan in his comment in 23 Or L Rev 269, 273 (1944) on the *Wyckoff* case. There he states:

"* * * [T]he court, both majority and minority, approves the instruction of the trial judge that the burden of proof that decedent met his death by accident, not by suicide, is upon plaintiff. It is generally, if not universally, agreed that to instruct a trier that a party has the burden of proving a fact is to direct the trier to find the nonexistence of that fact if his mind is in equilibrium, that is, unless he is convinced that its existence is more probable than its nonexistence. Therefore the court, including Mr. Justice Belt, would have the jury instructed in effect that they must find that the insured committed suicide unless they are convinced that it is more probable that his death was caused by accidental means than by his intentional act. At the same time Mr. Justice Belt would have them instructed in plain and simple language that, unless their minds are satisfied by the evidence that the insured committed suicide, they must find that the insured drowned by accident. By what mental gymnastics could a jury or any other trier of fact obey both these instructions? Where the existence of the presumed fact is made an issue by the pleadings in a case, to say that a party has the burden of

satisfying the minds of the jury that the presumed fact does not exist is to say that the party has the burden of persuasion on that issue. It can mean nothing else."

Professor Morgan concludes that the *Wyckoff* case demonstrates again "the impossibility of a rational interpretation of a rule which purports to make a presumption evidence, which requires it to persist until the mind of the trier has been satisfied of the non-existence of the presumed fact by evidence, and which is held not to affect the burden of persuasion."

 We believe that this criticism of the form of instruction approved in the *Wyckoff* case is sound. The same criticism is applicable to the form of instruction given in some of our previous cases.[1] In our previous cases we have recognized that in an action brought on the double indemnity provisions of an insurance policy the plaintiff has the burden of proving death by accident. We reaffirm this position.[2] Therefore, it is

---

[1] E.g., Stage v. St. Pierre, 224 Or 395, 400, 356 P2d 432 (1960) (presumption against negligence); Freytag v. Vitas, 213 Or 462, 467, 326 P2d 110 (1958) (presumption that a thing once proved to exist continues as long as is usual with things of that nature); Fowler v. Courtemanche et al, 202 Or 413, 453-54, 274 P2d 258 (1954) (presumption that a person is innocent of wrong). Semble, Dimitroff v. State Ind. Acc. Com., 209 Or 316, 306 P2d 398 (1957) (presumption that official duty has been regularly performed); State v. Robinson, 120 Or 508, 252 P 951 (1927) (presumption of intent to defraud and of knowledge of insufficient funds).

[2] We recognize that a contrary view has been expressed. Thus in McCormick, Evidence, pp. 671-672 (1954) it is argued that presumptions "having a substantial backing of probability" (which, we assume, would include the presumption against suicide) should have the effect of shifting the burden of proof to the party against whom it operates. This view is also adopted by Morgan, Presumptions and Burden of Proof, 47 Harv L Rev 59 (1933). We see no reason for giving the probability against suicide a special value as evidence nor are we able to find any policy considerations justifying the imposition of the burden of proof on the insurer.

improper to instruct the jury, as was done in the present case, that "unless the presumption against suicide has been overcome by sufficient evidence to satisfy you it is presumed that * * * death was the result of an accidental bodily injury and was not the result of suicide."

In concluding that such an instruction is improper, we have not overlooked ORS 41.360 which provides in part that disputable presumptions "may be controverted by other evidence * * * but unless so overcome, the jury is bound to find according to the presumption." This section is susceptible to more than one interpretation. On the one hand, it may be read as applying only where no evidence opposing the presumption has been adduced and as binding the jury only under such circumstances. On this view, if there were *some* evidence opposing the presumption, the jury, taking into consideration all of the evidence introduced by both parties, would be free to decide either way. Were the evidence in equipoise, the jury would be bound to find for the defendant inasmuch as plaintiff would not have met his burden of proof. On the other hand, the statute may be interpreted to apply even in cases where evidence opposing the presumption has been adduced. On this view, the jury would be bound to find according to the presumption unless such opposing evidence exceeded or outweighed the presumption and thus "overcame" it. This interpretation would place the burden of proof on the person forced to meet the presumption.

We do not think that the legislature intended ORS 41.360 to have this latter meaning. As is explained in a footnote in Deady's Code, the chapter on evidence (including what is now ORS 41.360) was "mainly con-

densed and extracted from Greenleaf's Treatise on the Law of Evidence" (p. 315). ORS 41.360 was very probably an attempt to state the principal expressed in section 33 of Redfield's Edition of Greenleaf's Treatise.[9] In that section Greenleaf, discussing presumptions, explains that "if *no opposing evidence* is offered, the jury are bound to find in favor of the presumption." (Emphasis supplied). It seems reasonable to construe ORS 41.360 to express the meaning found in the foregoing quotation from Greenleaf.

In *Hansen v. Oregon-Wash. R. & N. Co.*, 97 Or 190, 188 P 963, 191 P 655 (1920), the word "overcome" is construed to mean equal or outweigh. Thus it is said that "when the evidence for the defendant equals and balances the evidence for the plaintiffs, the defendant has just as effectively "overcome" the evidence for the plaintiffs as though the defendant's evidence incomparably and overwhelmingly outweighed the evidence for the plaintiffs." (p. 224-225). We do not think that the word "overcome" as used in the instruction given in the present case would be understood by the average juror as having the meaning ascribed to it in the foregoing quotation. We believe that most jurors would understand the word "overcome" to mean "outweigh" and to regard the instruction as an admonition that a verdict must be returned for the plaintiff unless defendant established by a preponderance of the evidence that death by suicide was more probable than death by accident.

Although it was error to instruct the jury, in effect, that the presumption stands unless overcome by op-

---

[9] The Redfield Edition was published four years after the Code was enacted. It is likely that the earlier edition used in drafting the Code contained essentially the same exposition as section 33 of the Redfield Edition.

posing evidence, defendants did not call the error to the trial court's attention. As we have already observed, the instructions were excepted to on the ground that they improperly referred to a presumption of accident rather than a presumption against suicide. This, we have held, was not error. Defendants made no exception to the language of the instruction which we have found objectionable. Defendants did request an instruction to the effect that if the evidence was evenly balanced the verdict should be in favor of the defendants. This did not draw the trial court's attention to the error in the instruction given and in view of the fact that the court had instructed the jury as to plaintiff's burden of proof, the requested instruction would be unnecessary but for the confusion created by the instruction relating to the effect of the presumption. Since the defect in the instruction was not brought to the trial court's attention, we shall not regard it as reversible error.

■ Nothing that we have said should be taken to mean that the jury should not be instructed on the effect of the presumption against suicide. We hold only that the instruction should not describe the presumption as standing until the jury is satisfied that it has been overcome by evidence to the contrary. The jury should be told that there is a presumption against suicide. The basis for the presumption should be explained, i.e., the normal human revulsion against taking one's own life. It would be proper to explain to the jury that it may infer that because people normally do not take their own lives because of this instinct for self-preservation, the deceased did not take his own life in the case before it. The jury should be told that the improbability of suicide is to be treated as any other

evidentiary fact and that the presumption does not endow the fact upon which it is based with any special value for evidentiary purposes. As stated in *Jefferson Standard Life Ins. Co. v. Clemmer,* 79 F2d 724, 731 (4th Cir 1935), "the jury should be permitted to give the inference such weight as it deems best, undisturbed by the thought that the inference has some sort of artificial probative force which must influence their deliberation." The court goes on to say:

> "* * * Likewise as to the opposing evidence, the jury should be instructed to weigh its credibility and effect in the usual way, and finally, upon the whole evidence, to determine whether death by accident has occurred, bearing in mind that if the evidence leaves their minds in such doubt that they are unable to decide the point, the verdict should be against the party upon whom the burden of persuasion rests. Such a charge can be easily understood and enables the jury to do justice to both sides."

The evil to be avoided is couching the instruction in language suggesting that the presumption stands unless overcome by evidence sufficient to satisfy the jury to the contrary, because an instruction in that form places the burden of proof on the defendant.

■ Defendants contend that error was committed in sustaining plaintiff's objection to an offer of proof in which Dr. Shanklin, a psychiatrist, expressed his opinion with respect to the emotional state of persons prior to committing suicide. The evidence developed by plaintiff tended to show that Powell was a person well adjusted to his surroundings; that he was happy and with no apparent reason for committing suicide. The offer of proof purported to show that suicides some-

times occur when a person is not despondent. Dr. Shanklin testified as follows:

> "They [suicides] don't necessarily occur in the depths of despondency. Speaking generally, in other levels of retardation you will see your great peak of suicides as the improvement begins. This is the pattern, so that the behavior the day before or week before, even though it is quite jolly and socially correct, appropriate in all respects,—this is of no moment in deciding whether or not this particular act was suicide or accident."

If this is a statement simply that some people commit suicide even though immediately preceding it they manifest a jolly spirit and correct social attitude, the testimony does not inform the members of the jury of anything they would not already know from their general observation. If the witness was purporting to tell the jury that in certain cases in which a person's condition is improving there is a pattern of suicide in spite of an outward appearance of jollity, the statement is too vague and not sufficiently related to Powell's condition.

This court is unable to discern from testimony what scientific phenomenon the witness was attempting to describe or how it relates to the particular death in this case, and we do not think the jury was in any better position to do so. The trial court refused to accept the offer of proof on the ground that it dealt with a matter within the province of the jury and that it was "too speculative." Apparently the trial court interpreted the testimony as we do. We hold that there was no abuse of discretion in rejecting the offer of proof.

The judgment is affirmed.

SLOAN, J., concurring.

The opinion in a petition for rehearing in *Hansen v. Oregon-Wash. R. & N. Co.*, 1920, 97 Or 222, 191 P 655, satisfies me that the challenged instruction given in this case was not wrong. I, therefore, concur in the result.

GOODWIN, J., dissenting.

The majority opinion attempts to construct a hypothesis of accidental death. I do not believe that the facts set forth in the opinion support any plausible hypothesis of an accident. If the circumstantial evidence tended to prove anything, it proved only that the deceased shot himself in the mouth while lying on his back on a bed. He may or may not have intended that result. Based solely upon the evidence in this case, and excluding the presumption relied upon by the plaintiff, any verdict attempting to decide between suicide and accidental death strikes me as pure guesswork.

The majority holds that there is a presumption against suicide. If there is such a presumption, then the presumption would, under our evidence statutes, carry the plaintiff's case to the jury. I question, however, whether there ought to be such a presumption. See White, *Presumptions in Violent Death Cases or Quo Vadis Presumption?*, 15 U Miami L Rev 1 (1960). The generality upon which the so-called presumption is based is too broad to justify its employment as evidence in every case of an unexplained violent death. If the majority view is correct, it would be equally logical to employ the presumption in exactly the same way in the case of an unwitnessed death by hanging. The possibility that a man would accidentally fashion

a noose and hang himself is no less likely than the possibility that the decedent in the case at bar lay down on his back and accidentally shot himself.

The majority holds, however, that the presumption operates. While I do not concur in that view, I agree that there was error in the manner in which the presumption was explained to the jury.

The majority acknowledges that in a case of this kind the burden of proof does not shift, and that it is error to instruct the jury in effect that the burden is upon the defendant to overcome the presumption against suicide. Accordingly, if for no other reason, the defendants are entitled to a new trial. Whether or not the error which the majority recognizes as error was properly preserved by exception, the jury did not understand the effect of the presumption as the majority says it should be understood. I cannot accept the majority's reasoning that the error in this case was not reversible.

The jury was told that the presumption is evidence, and that "the plaintiff is entitled to its benefit throughout the trial of this case and throughout your deliberations on the facts until such time, if ever, as sufficient evidence may satisfy your minds to the contrary."

The instruction upon which the jury presumably relied in its deliberations thus shifted to the defendants the burden of proving that the deceased intentionally shot himself. In shifting the burden of proof to the defendants, the challenged instruction denied the defendants a trial upon the theory that the majority says is correct.

I concede that the defendants did not phrase their exception with the learning that might be employed

after reading the majority opinion in this case. I believe that the error, however, was one that went to the heart of the matter in controversy, and that such an error should be noticed under Rule 46.

We all recognize that the trial judge was following the law as it had been declared in our former opinions. It should go without saying that in a case of this kind when we are re-examining an important rule of law a finding of error implies no want of learning upon the part of the trial court. If we make a substantial change in the rule we likewise should not hold a litigant responsible for a failure to state his exception with prophetic insight concerning the rule that will emerge upon appeal.

I would reverse the judgment and remand the cause for a new trial under the law as set forth in the majority opinion.

MCALLISTER, C. J., and ROSSMAN, J., join in this dissent.