Argued April 8, reargued November 3, 1966, affirmed
February 1, 1967

# STATE HIGHWAY COMMISSION *v.* HEINTZ CONSTRUCTION CO. ET AL

423 P. 2d 175

*Alan H. Johansen,* Assistant Attorney General, Salem, argued and reargued the cause for appellant. With him on the briefs were Robert Y. Thornton, Attorney General, and G. E. Rohde, Assistant Attorney General, Salem.

*Leo Levenson* and *Norman B. Kobin,* Portland, argued and reargued the cause for respondents. With them on the brief were Kobin & Meyer, Portland.

Before McALLISTER, Chief Justice, and PERRY, SLOAN, O'CONNELL, GOODWIN, DENECKE and HOLMAN, Justices.

DENECKE, J.

The defendants were joint venturers who performed the grading contract for the plaintiff Highway Commission in the construction of nine miles of Interstate 5. The Commission brought this action to recover an alleged overpayment of $75,000 made to

the defendants. The joint venturers counterclaimed for the $72,000 retainage held by the Commission. The jury returned a verdict in favor of the Commission for the entire amount sought. The trial court granted defendants' motion for a new trial and plaintiff appeals.

The motion for a new trial stated many alleged grounds. The order granting the new trial and the parties' briefs are limited to the issues of whether the instructions given were correct, whether the jury was adequately instructed, and whether the forms of verdict submitted to the jury were correct.

As in most construction contract cases, the issues are technical, difficult for laymen to comprehend and ill-adapted for jury determination. The experienced trial judge commented: "This has been the most amazing lawsuit I have ever tried, factualwise and legalwise."

The contract was to construct the roadbed and did not include placing the road surface. Performance involved cutting through the hills and filling in the valleys, thus bringing the bed to a grade or elevation fixed by the Commission.

Prior to the putting out the job for bids, the Commission made a detailed study of the work to be done and prepared plans and specifications. These included the approximate quantities of materials to be excavated and handled. For example, general excavation, 1,688,000 cubic yards; toe trench excavation, 20,400 cubic yards. The primary portion of the bids was an offer to perform the work at a price per unit of the work estimated to be done. For example, the toe trench excavation was bid at 50 cents per cubic yard; based upon the estimated amount of 20,400 cubic yards of such excavation to be required, the bid on this item

was $10,200. When the work is actually performed it must be determined how many cubic yards of toe trench excavation has been done and the contractor will be paid 50 cents per cubic yard of cubic yards for such work whether it is more or less than the quantity originally estimated.

The performance of construction work such as this takes a long period of time; therefore, contracts covering such work customarily provide, as does this contract, for monthly payments based upon an estimate of the amount of work performed during the past month. A small percentage of the amount estimated due is kept by the Commission as retainage, a form of surety. The joint venturers received 16 monthly payments. When the entire job was completed and computation of the total cost of the work was made by the Commission, it was of the opinion that the joint venturers had been overpaid by $147,000. The Commission demanded the return of $75,000 and stated its intention to permanently retain the retainage in the amount of $72,000.

The principal cause of the dispute was excavation below subgrade and then the backfilling of such space. The joint venturers' job was to prepare the roadbed to subgrade. (Another contract would be let to lay a base course on the subgrade and surface the road at finish grade.) The plans called for the contractor to excavate 18 inches below subgrade and replace such excavated area with selected subgrade material. Under the contract the joint venturers were to be paid at the general excavation unit price for this below subgrade work plus 10 cents per cubic yard for selected subgrade material. The Commission's resident engineer testified:

"We used the select subgrade material to re-

inforce the road. In other words, when the native material is not suitable or we do not consider that it has sufficient bearing capacities to support the gravel, the pavement, and the traffic that will be on the road, then we will excavate out these inferior materials and replace them with the selected subgrade material."

The specifications provided that these selected subgrade materials would be of granular nature. The materials could come from excavation made in constructing the road bed or from "borrow areas."

All agree that when the job was initially staked out, before any work began, the stakes were placed and marked to indicate that the contractor should excavate to 18 inches below subgrade, i.e., in accordance with the original plans.

■ The resident engineer testified that after the work commenced, he determined by visual observation that in the seven rock cuts and in one other area the native material, rock, had suitable bearing capacity to hold the finish course and the subsequent traffic. Therefore, he testified he verbally instructed the contractor not to excavate below subgrade in those areas and not to place selected subgrade materials. Commission witnesses testified that these areas were restaked to indicate that the contractor should only excavate to subgrade, and not 18 inches lower. Contrary to the provisions of the contract, this alleged change in the work to be performed was not by written order.[1] The alleged writing on the stakes the Commission claims were reset does not constitute that permanent record that the contract contemplated when it required changes to be in writing. *Courtney v. Provincial Exhibition Commission,* 41 Nova Scotia 71 (1906).

---

[1] No substantial issue was raised as to the enforceability of a change not embodied in a written order.

The defendants' witnesses testified that the areas had not been restaked and no instructions had been received to grade only to subgrade and not 18 inches lower. Defendants' foreman testified he asked the Commission's engineer if he had to excavate certain rock 18 inches below subgrade. He stated that the engineer said it all had to be excavated, otherwise with some subgrade solid and others filled it would settle unevenly and result in bumps in the pavement. The defendants' witnesses testified that the contractor did excavate to 18 inches below subgrade and placed selected subgrade materials in these areas.

After the contractor started performance and monthly estimates and payments were made, the resident engineer approved payments for general excavation 18 inches below subgrade and for the placing of selected subgrade materials in those areas in which he testified he had instructed the contractor not to excavate below subgrade. His explanation was that his personnel made their computations of what the contractor had performed on the basis of the computations from the original plans which required excavating to 18 inches below subgrade and the placing of selected subgrade materials. He stated: "* * * It was an error on my part that I did not eliminate these overexcavations, if you will, or this 18 inches, from those areas early in the project. The simple truth of the matter is, I completely forgot about the stuff."

Eventually, the resident engineer realized the contractor had been paid for excavation and material placement that the engineer had testified he ordered the contractor not to do and that it did not do. He had an assistant compute the amount of excavation and

selected subgrade materials called for in those areas from which they had been deleted. Unit prices for these quantities, together with unit prices for hauling said materials, were subtracted from the total amount paid by the monthly payments. Because of these subtractions the final estimate indicated that the contractor had been overpaid.

■ We agree with the trial court that the jury was not correctly or adequately instructed.

The controversy over the instructions to the jury primarily concerned the effect the jury must give the monthly payments and the after-completion final cost computation of the Commission.

The trial court instructed:

"There is a disputable presumption that an official duty, required by law to be performed, has been duly and regularly performed. The State highway engineer is required by law, either personally or through his assistants, to make estimates determining the amount earned under highway construction contracts. The contract entered into by the plaintiff and the defendants provides, in part, that all partial estimates of work performed are subject to correction in the final estimate. Thus there is a presumption that the engineer's final estimate was duly and regularly made. However, there is no presumption that the final estimate was correct but merely prima facie, or on its face, correct.

"There is also a disputable presumption that money paid by one to another was due to the latter. In other words, you may presume that the money paid by the State Highway Department to the defendants was due the defendants, and thus, ladies and gentlemen, the burden of proof in this case rests upon the State Highway Department to prove

by a preponderance of the evidence that payments made to the defendants were a mistake as alleged in plaintiff's complaint, or, in other words, they must prove the material allegations of their complaint by a preponderance of the evidence."

These were the only instructions directed to the specific issues in the case. Defendants excepted to such instructions and requested instructions stating their theory.

In its order granting the new trial the court stated that it believed it erred "due to errors relating to instructions to the jury pertaining to the prima facie status of the final estimate without giving any regard to the effect of the other monthly progress estimates and payments and thereby over-emphasizing and placing undue stress on the final estimate  *  *  *  and because of the complex nature of the issues of fact the court did not adequately and fully instruct the jury  *  *  *."

ORS 41.360 sets out 39 disputable presumptions. Among these is: "(15) Official duty has been regularly performed."

As seen from the afore-quoted instruction, the court charged the jury that there is a presumption that the final estimate was "duly and regularly made" but there is no presumption that the final estimate was correct. However, the court then said that the final estimate was "merely prima facie, or on its face, correct." The trial court had just previously instructed: "Prima facie evidence is defined as that evidence which suffices for the proof of a particular fact until contradicted and overcome by other evidence." Therefore, the court by instructing that the final estimate was

prima facie correct, in effect instructed that there was a presumption that it was correct.[②]

In *Sweeney v. Jackson County,* 93 Or 96, 120, 178 P 365, 182 P 380 (1919), we stated: "The final estimate assailed in this suit is merely *prima facie* correct." The basis for such a statement is not articulated; however, it probably was a provision in the public contract involved which made final the decision of the state engineer in all controversies to which the provision is applicable. The court stated the usual rule that such a provision is binding unless fraud or gross mistake are proved. It then found that gross mistake was proved. The statement is not completely correct. If the provision is applicable the engineer's decision is conclusive, not merely "prima facie." If fraud or gross mistake is proved the engineer's decision has no evidentiary weight.

The Highway Commission has not referred us to any decisions deciding whether the statutory or common-law presumption that official duty has been regularly performed is applicable to facts such as are here present, nor have we found any direct authority upon the question. Wigmore points out:

"It may be said that most of the instances of its application are found attended by several conditions; first, that the matter is more or less in the past, and incapable of easily procured evidence; secondly, that it involves a mere formality, or detail of required procedure, in the routine of a litigation or of a public officer's action; next, that it involves to some extent the security of apparently vested rights, so that the presumption will serve to

---

② This is not intended as a precise statement of the effect of presumptions, of a definition of "prima facie" or the effect of the trial court's further instruction that the state retained the burden of proof. On these matters see U. S. National Bank v. Lloyd's, 239 Or 298, 323, 325, 382 P2d 851, 396 P2d 765 (1964).

prevent an unwholesome uncertainty; and, finally, that the circumstances of the particular case add some element of probability." 9 Wigmore, Evidence (3d ed) 488, § 2534.

Examples are the presumption that district boundary board posted election notices: *School District No. 17 v. Powell,* 203 Or 168, 279 P2d 492 (1955), or the presumption that a judgment was entered the day it was given: *Allen v. Levens,* 101 Or 466, 198 P 907, 199 P 595 (1921).

The presumption is usually applied as evidence of the act of a neutral, dispassionate and impartial official, with no interest in the matter except to regularly perform the duties imposed upon him. It is frequently applied as proof of acts of a judge or other court officers. *State ex rel Livingstone v. Williams,* 45 Or 314, 77 P 965, 67 LRA 167 (1904); *Freeman v. Preston,* 49 Or 175, 89 P 375 (1907); *State v. Lillie,* 172 Or 194, 139 P2d 576 (1943).

At the trial the principal contention of the Commission was that the final estimate was correct because the engineer had verbally ordered deleted some of the subexcavation required by the original plans. There is no reason to hold that the engineer's version of that issue is presumed to be correct, particularly when, if his version is correct, he failed regularly to perform his duty by failing to comply with the contract by making the change by written order. On this issue the engineer cannot help but be an adversary and not a neutral, impartial officer.

■ We hold the statutory presumption is not applicable to those facts.

The Commission also contends that the instruction that the final estimate was prima facie correct was

not prejudicial as it was entitled to a more favorable instruction that the final estimate of the engineer was conclusive and a verdict for plaintiff should be returned. It has alleged this theory in its reply.

The contract provides (Standard Specifications 1.9.10):

"At a regular period each month the engineer shall make an estimate of the amount of work completed and of the value of such completed work. * * *. With these estimates as a base, a partial payment shall be made to the contractor, which partial payment shall be equal to the value of completed work as computed from the engineer's estimate * * *.

"* * * * *

"The estimates upon which partial payment are based are not represented to be accurate estimates, and all quantities shown therein are subject to correction in the final estimate. * * *"

Section 1.9.13 provides:

"As soon as practicable after the completion and acceptance of the work under the contract, there shall be prepared by the engineer a final estimate of the quantities of the various classes of work performed. With this estimate of quantities as a base, determination shall be made of the total amount earned by the contractor in accordance with the terms of the contract * * *.

"* * * * *

"All prior partial estimates and payments shall be subject to correction in the final estimate and payment."

Section 1.5.1 provides:

"To prevent misunderstandings, disputes and litigation it is expressly understood by all of the parties to the contract, including the surety, that the engineer shall, in all cases, determine any and all questions which may arise concerning the qual-

ity, quantity, and acceptability of materials furnished and work performed; the manner and rate of progress of the performance of all work; the interpretation of plans and specifications; and the amounts and classifications of the several kinds of work and materials; and his estimates and decisions in these matters shall be final, binding, and conclusive upon all parties to the contract."

■ This court has held, consistent with other jurisdictions, that if the engineer's decision falls within the purview of the provision just above quoted, it is final and can only be set aside by proof of fraud or gross mistake. *Friberg v. Elrod,* 136 Or 186, 296 P 1061 (1931); *Baker v. Multnomah County,* 118 Or 143, 246 P 352 (1926); Annotation, 110 ALR 137, 143 (1937). We find, however, that the controversy here is not governed by this provision.

As stated, one of the controversies is whether the engineer changed the work required in the original plan by deleting certain subgrade excavation. This is not an issue encompassed by the above-quoted provision. This is not a question of "quality, quantity, and acceptability of materials furnished and work performed," or does not involve "the manner and rate of progress," or "interpretation of plans and specifications; and the amounts and classifications of the several kinds of work and materials."

The reason behind such provisions lends further support to our holding. In *Mayer v. East Side Logging Co.,* 130 Or 341, 354-355, 278 P 957, 280 P 343 (1929), the court stated:

"* * * Provisions of the kind now before us, we are told in the case last cited, had their origin in contracts for the building of important and extensive government works and were designed to avoid harassing litigation over questions that could only

be determined efficiently by those possessed of scientific knowledge. * * *"

The question in this instance of determining whether or not the engineer changed the work does not depend upon scientific or technical observation or knowledge, but upon a determination of the credibility of the witnesses. The Commission's witnesses say the work was changed and the joint venturers' witnesses say it was not.

■ Our conclusion that the delegation to the engineer of the power of final determination is limited in scope is also supported by the general judicial view that the grant of power to conclusively determine controversies arising under the contract must clearly be expressed.

As stated, the principal contention at trial of the Commission was that the subexcavation and replacement by select materials in the rock cuts had been verbally deleted and, therefore, the Commission was not obligated to pay for any subgrade excavation or the replacement of materials at these locations. However, if it is found that the Commission did not make this deletion, there is an issue on the quantity of materials excavated and replaced with select material in these rock cuts. On this issue, i.e., the quantity of material excavated and replaced, if the engineer actually made a determination under the disputes clause above quoted of such quantities, this determination would be final unless there was fraud or gross mistake.

Affirmed.