Argued December 6, 1973, affirmed April 11, 1974

McHORSE, *Respondent-Cross-Appellant, v.*
PORTLAND GENERAL ELECTRIC COMPANY,
*Appellant-Cross-Respondent.*

521 P2d 315

324

*Jarvis B. Black, Portland,* argued the cause for appellant and cross-respondent. With him on the briefs were Phillips, Coughlin, Buell, Stoloff & Black, Portland.

*Lawrence N. Brown and D. Keith Swanson,* Salem, argued the cause for respondent and cross-appellant. With them on the brief were Brown, Burt & Swanson, Salem.

HOWELL, J.

Plaintiff filed this suit to require defendant to specifically perform a long-term disability income plan which the defendant had initiated for the benefit of its employees. The trial court entered a decree in favor of plaintiff, and defendant appeals. Plaintiff states that his complaint is in equity and the defendant denominates the plaintiff's case as a declaratory judgment proceeding. Both parties agree that the cause should be determined as a suit in equity. Under these circumstances we will try the issues *de novo.*

The facts are generally undisputed.

Plaintiff had been employed by defendant as a journeyman lineman and working line foreman from 1949 until December, 1971, when he terminated his employment pursuant to his doctor's orders. Plaintiff applied for and received benefits under the defendant's Long-Term Disability Income Plan. The plan contained the following provisions:

## "DEFINITION OF TOTAL DISABILITY

"4. Total disability as used herein may result from sickness (except those disabilities specifically excluded) or an accident. Total disability as used herein does not mean a state of absolute physical helplessness. It is sufficient if the

disability is such that common care and prudence require the employee to desist from transacting any business in order to *effect a cure* or if he is unable to engage in any occupation for which he is reasonably suited by experience, education or training.

"* * * * *

## "INTERPRETATION AND ADMINISTRATION

"12. The Company reserves the right to interpret and administer the plan, and such decisions shall be final. The Company reserves the right to discontinue this plan at any time." (Emphasis in text)

Shortly after the plaintiff had filed his application for the benefits, he had a conversation with defendant's manager of industrial relations. Plaintiff enjoyed fishing and boating, and the manager, in a discussion with plaintiff about jet boating, became suspicious that one who could qualify for total disability under the plan could also operate a jet boat, so private investigators were hired to place plaintiff under surveillance. Motion pictures were taken showing plaintiff operating a riding lawn mower, bending over the hood of his car, unhooking his boat and placing it in the river, and fishing. The pictures were shown to Dr. Davis, who had examined plaintiff and had qualified plaintiff for the benefits under the plan. After seeing the movies, the doctor modified his opinion of plaintiff's condition and the defendant terminated the benefits, resulting in this cause being filed by plaintiff.

■ The trial court, in a letter opinion, found that plaintiff qualified for total disability under the plan. The defendant contends that the court erred, but admits that there is evidence in the record to support the

finding. After reviewing the record, we agree with the trial court.

Section 4 of the plan states that an employee is totally disabled if he is unable to engage in any occupation for which he is reasonably suited by experience, education or training.

The plaintiff is 51 years of age with a fifth grade formal education.

In *Fagerlie v. New York Life Ins. Co.*, 129 Or 485, 498, 278 P 104 (1929), we adopted the following as the test for total disability in the context of an insurance policy:

"* * * [T]he proper test of disability is to determine whether the insured can do sufficient work so that he may engage in some occupation for remuneration or profit: * * *. [Citations omitted].
"* * * * *

"In annotations at page 1376, 41 A.L.R. we find thus:

" 'As stated in the earlier annotations, the weight of authority supports the view that provisions in accident policies for indemnity in the event the insured is totally or wholly disabled do not require that the accident shall render the insured absolutely helpless, but such provisions are construed as meaning such a disability as renders him unable to perform the substantial and material acts of his business or occupation in the usual and customary way. * * *' "

In the context of a workmen's compensation claim,

"* * * permanent total disability is defined as any condition which permanently incapacitates a workman from regularly performing any work at a gainful and suitable occupation. * * *" *Swanson v. Westport Lumber Co.*, 4 Or App 417, 419, 479 P2d 1005 (1971); ORS 656.206 (1).

Dr. Holm, an orthopedic physician and surgeon who had been plaintiff's treating physician for years, testified that plaintiff's hip was abnormal, "the socket is shallow, and the ball that fits in the socket is asymmetrical and increased in size." Plaintiff also had osteoarthritis of the spine and a "discrepancy in leg length" resulting in a curvature of the spine. In Dr. Holm's opinion, plaintiff was totally disabled, and even if he had surgery, plaintiff would still be unable to carry on any type of suitable work.

Dr. Rinehart, a rheumatologist, testified that plaintiff had a congenitally shallow hip socket which produces arthritis. He also found plaintiff "was totally disabled with regard to any gainful activity."

Both Dr. Holm and Dr. Rinehart testified that the motion pictures of plaintiff engaging in various activities would not change their opinion of his disability.

Assuming that plaintiff exaggerated his symptoms to Dr. Davis, we believe that the record nonetheless shows that plaintiff is disabled. Dr. Davis testified concerning his original diagnosis:

"My impression was that this man had degenerative arthritis of the right hip, secondary to an old anomoly of the acetabulum, and that he had degenerative arthritis of the cervical and lumbar spine areas. * * * I can't conceive an occupation that this man would engage in."

He stated the following regarding his opinion after viewing the motion pictures:

"A   As a result of my examination, I would have believed that he would have been incapable of carrying out the things that I saw him doing in these movies. From what I found on examination, I thought that he would be incapable of doing the

things that I saw him doing in the movies, so I would have to change my opinion in relation to this man's ability to do some things in society, which I didn't think he could do as a result of my examination originally.

"Q I think we are agreed that he couldn't continue work as a lineman under any circumstances?

"A No, I think this man has enough objective evidence of disease that he would not be able to work as a lineman. *I further believe this man cannot continually work in a standing, walking or twisting occupation.*

"Q If it were in and out of a car, for instance, for short periods of walking, short periods of standing, or at a desk job, do you have an opinion as to whether or not Mr. McHorse could do this, after seeing—

"* * * * * *.

"A I don't know that I would—not having ever engaged in selection of workmen for occupations— I'm no occupational expert—but, as a physician, specializing in the local motor system, *I would feel that this man could engage in some occupations preferably those occupations that would give him the ability to move around some, but also the ability to rest in a sitting position.*" (Emphasis supplied.)

He also stated:

"Q You don't still quarrel with your first findings that he had a degenerative hip condition, degenerative arthritis of the right hip, and degenerative arthritis of the cervical and lumbar spine? You still don't quarrel with those findings?

"A Those are accurate diagnoses.

"Q Are we in accord, too, that this type of physical condition does not improve with time?

"A Do I expect it to improve?

"Q. Yes.

"A No, I don't expect it to improve."

The defendant's manager of industrial relations testified that it was company policy under the plan that if an employee could function in a less strenuous job he was not eligible for total disability classification. He suggested that while plaintiff could no longer work as a lineman, he could possibly work as an estimator, a service inspector, or a storeroom operator. However, he also testified that he would not give plaintiff employment in any one of these positions "because he wasn't honest with us."

A retired lineman for defendant who knew plaintiff testified plaintiff could not perform "estimate work" because of the necessity of walking over rough terrain; he could not qualify as a service inspector because it would require "wading through mud and snow"; he could not be a storeroom man because it would entail heavy lifting; he was not sure whether plaintiff could be a traveling operator or not because a substantial amount of driving would be required.

Considering all the testimony, the following facts are undisputed: the plaintiff has, *inter alia*, a serious congenital hip defect and degenerative arthritis of the hip and spine which will become progressively worse; he is 51 years old with a fifth grade education; he has had no occupational training except as a lineman; while there was some evidence that he could perform in a job allowing some minor movement but with opportunity to rest by sitting down, there was no showing that such jobs were available.

We conclude that plaintiff qualifies for total disability under the plan.

The next issue is whether the defendant's de-

cision to terminate plaintiff's benefits under Clause 12 of the plan is a final decision binding on the parties.

■ ■ The courts have viewed plans such as these differently, depending on whether or not the plan calls for a contribution by the employee to the plan; however, it would seem that in the situation where the employee has satisfied all conditions precedent to becoming eligible for benefits under a plan, the better reasoned view is that the employee has a vested right to the benefits. This view sees the employer's plan as an offer to the employee which can be accepted by the employee's continued employment, and such employment constitutes the underlying consideration for the promise. *Taylor v. Mult. Dep. Sher. Ret. Bd.,* 265 Or 445, 510 P2d 339 (1973) ; *Ball v. Victor Adding Machine Company,* 236 F2d 170 (5th Cir 1956) ; *Jacoby v. Grays Harbor Chair & Mfg. Company,* 77 Wash 2d 911, 468 P2d 666 (1970). This approach seems particularly appropriate to the instant case, as here the plan was the result of a negotiated labor contract. *See Vallejo v. American R. Co. of Porto Rico,* 188 F2d 513 (1st Cir 1951). Therefore, we view this plan not as a gratuity but as a contract which forms part of the consideration flowing between the employer and his employees.

■ ■ We will assume that the provision in the plan which states that defendant's decision shall be final when it "interprets and administers" the plan applies to a determination of an employee's physical condition and eligibility for benefits under the plan. Early cases involving situations where the contract provided that one party was to have the final decision viewed such clauses as illegal because they ousted the courts of their jurisdiction. *Lane v. Brotherhood of L. E. & F.,* 157 Or 667, 73 P2d 1396 (1937); *Baltimore &*

*O. R. Co. v. Stankard,* 56 Ohio 224, 46 NE 577 (1897);
*but compare Rueda v. Union Pacific Railroad Co.,* 180
Or 133, 175 P2d 778 (1946); *Shipe v. Norfolk & Western
Ry. Co.,* 51 Ohio App 361, 1 NE2d 174 (1935). We
believe that judicial review is proper, particularly
where the plan allows for the final decision to be made
by one of the parties. *Hurd v. Illinois Bell Telephone
Co.,* 136 F Supp 125 (ND Ill 1955); *Railway Passenger
& F. C. Mut. Aid & Ben. Ass'n v. Robinson,* 147 Ill
138, 159-160, 35 NE 168, 176 (1893); *but compare Rueda
v. Union Pacific Railroad Co.,* supra at 171-72.

Where courts do review decisions, the scope of
judicial review has been described as a review en-
compassing such things as: fraud or such gross mis-
take as to imply bad faith, or a failure to exercise an
honest judgment;[1] whether the employer acted ca-
priciously because the decision was not based on sub-
stantial reasons;[2] whether the claimant raises a gen-
uine factual issue under the terms of the plan which
indicates arbitrariness or bad faith;[3] whether there

---

[1] Menke v. Thompson, 140 F2d 786 (8th Cir 1944). In high-
way construction contracts which provide that the engineer shall
be the final authority concerning the quality and quantity of ma-
terials, we have held that the engineer's decision cannot be over-
turned in the absence of fraud or gross mistake. Highway Com. v.
Heintz Const., 245 Or 530, 423 P2d 175 (1967); Barbour & Son v.
Highway Com., 248 Or 247, 433 P2d 817 (1967). Gross mistake is
the failure to exercise skill or good faith in the discharge of his
duty. Friberg v. Elrod et al, 136 Or 187, 194, 296 P 1061 (1931).
The rationale for considering the engineer's decision to be final
in construction cases, except for fraud or gross mistake, is the
scientific expertise of the engineer. Highway Com. v. Heintz
Const., supra at 541, 542.

[2] Wilson v. Rudolph Wurlitzer Co., 48 Ohio App 450, 194 NE
441 (1934).

[3] Hainline v. General Motors Corporation, 444 F2d 1250 (6th
Cir 1971); Siegel v. First Pennsylvania Banking and Trust Co.,
201 F Supp 664 (ED Pa 1961). *See also* Teren v. First Nat. Bank
of Chicago, 243 Or 251, 412 P2d 794 (1966).

was bad faith, bias or prejudice;[4] or whether there was a lack of good faith and discretion.[5]

Considering all the circumstances previously mentioned, including the undisputed facts regarding defendant's physical condition, his meager education, and his employment potential, we conclude that the defendant's decision was not based on substantial reasons and was, therefore, arbitrary and capricious.

Plaintiff has filed a cross-appeal contending he was entitled to attorney fees because the plan constituted an insurance contract and therefore he would be entitled to attorney fees under ORS 743.114.[6]

■ The presence or absence of the word "insurance" in the contract is not determinative of this issue, but the courts must look behind the terminology used by the parties and, viewing the contract in its entirety, ascertain what it was that the parties intended to accomplish. *Richardson v. Railway Exp. Agency*, 258 Or 170, 482 P2d 176 (1971); 1 Couch on Insurance (Second) 39, § 1.12.

■ The plan in the instant case contemplates payment of income to a disabled employee. The sum to be paid is determined by reference to the length of service of the employee and the employee's salary at the time he was disabled. However, benefits continue only until the employee's 65th birthday, or his date of

---

[4] Rueda v. Union Pacific Railroad Co., 180 Or 133, 175 P2d 778 (1946).

[5] Teren v. First Nat. Bank of Chicago, supra n. 3.

[6] ORS 743.114 states: "If settlement is not made within six months from the date proof of loss is filed with an insurer and an action is brought in any court of this state upon any policy of insurance of any kind or nature, and the plaintiff's recovery exceeds the amount of any tender made by the defendant in such action, a reasonable amount to be fixed by the court as attorney fees shall be taxed as part of the costs of the action and any appeal thereon."

retirement, whichever occurs first. Also, the employee may not receive benefits if he is also receiving a pension.

From these provisions it is clear that the plan was conceived as an early retirement plan and not a plan of insurance. ORS 731.102 defines "insurance" as "a contract whereby one undertakes to indemnify another or pay or allow a specified or ascertainable amount or benefit upon determinable risk contingencies, and includes annuities."

A pension plan is not payable "upon a determinable risk" contingency, but is paid upon the employee's having satisfied certain eligibility requirements as conditions precedent to such payout. Similarly, this plan for payment of income upon proof of total disability does not contemplate that payments will be made upon a risk contingency, but will be paid, as a matter of course, if the employee becomes totally disabled prior to his normal retirement. Thus, it is not a policy of insurance within the meaning of ORS 743.-114, and the plaintiff may not recover attorney fees.

The decree of the circuit court is affirmed.

DENECKE, J., specially concurring.

I would affirm by reasoning which differs at least in terminology from that expressed by the majority.

The contract fixing the terms of the disability income plan was negotiated by the defendant company and a union. The contract provides: "The Company reserves the right to interpret and administer the plan, and such decisions shall be final."

I believe the majority's assumption that the decision that plaintiff was not entitled to disability benefits is included within the phrase, "to interpret and

administer the plan," is correct. The question is, of what effect is the phrase, "and such decisions shall be final." Without such phrase I suppose the court would retry de novo the same issues the company decided. With such phrase the judicial review will have to be something less or else the phrase means nothing. The trial court found "that Plaintiff has established by a preponderance of the evidence that he is totally disabled" or in the alternative, "that the denial of benefits would be an arbitrary exercise of authority by the Defendant."

This court has held that the fact that one of the parties to the contract is given the decision-making power in disputes between the parties does not render such a clause illegal or void. In *Elliott Contracting Co. v. Portland,* 88 Or 150, 171 P 760 (1918), the plaintiff contractor and the defendant city entered into a construction contract. The contract provided that as to certain disputes the decision of the city engineer would be "final and binding." We held:

"* * * While it might be improvident for the plaintiff to agree that the measurement of its work should be left to the defendant's officer we are not aware of any law preventing it from making such a stipulation. It is not contrary to public policy and if it chose thus to put itself at the mercy so to speak of the other contracting party's servant it had a right to do so. * * *." 88 Or at 155.

It may be thought that such a clause should only be valid in construction contracts in which the expertise of an engineer or architect is used and there is a necessity for expeditious decision. However, we upheld such a clause in circumstances much like the present. In *Rueda v. Union Pacific Railroad Co.,* 180 Or 133, 175 P2d 778 (1946), plaintiff and the defendant

company contributed to a hospital fund which was administered pursuant to a negotiated contract. The contract provided that the Chief Surgeon of the company would decide questions arising under the contract and there would be no appeal from his decision except to the "General Manager, whose decision shall be final." 180 Or at 137. We held this provision to be valid. 180 Or 170-173.

When there is a valid clause in the contract stating that the decision of a party is "final," we have held that such decision "is final and can only be set aside by proof of fraud or gross mistake." *Highway Com. v. Heintz Constr.*, 245 Or 530, 541, 423 P2d 175 (1967); *Barbour & Son v. Highway Com.*, 248 Or 247, 262, 433 P2d 817 (1967).

Assuming we adhere to those standards, they are not all-inclusive. A decision of a party to a contract administering or interpreting that contract should not be given any weight if it is contrary to the terms of the contract.

The only evidence of why the company decided the plaintiff was not totally disabled is an exhibit which is a letter from the company to plaintiff. The letter states, in part:

"On June 30, 1972 we showed Dr. Davis some movies taken of you during the month of June. In a recent letter Dr. Davis reports: 'As a result of reviewing the actions of this individual at the time these pictures were taken, I would be led to believe that his actions are not compatible with the examination and *expression* of physical findings that *he* made when *he* was here in my office - - - I would be *led to believe* that he would have been incapable of carrying out the things I saw him doing in these movies.'

"In other words, the evidence clearly indicates you misrepresented your condition to Dr. Davis and to the Company. Therefore your disability payments from the Company will stop immediately and you are terminated as of this date."

The letter states that plaintiff's disability status is being terminated because "you misrepresented your condition to Dr. Davis and to the Company." The inference could be drawn from the letter that the company is terminating his disability status because of a finding by Dr. Davis that plaintiff is not totally disabled. However, the trial court was justified in finding that the letter meant what it literally says,—that the company terminated plaintiff, not necessarily because he was not totally disabled within the meaning of the plan, but because he misrepresented his condition to the company. That this was the basis of the company's decision is substantiated by testimony of the author of the letter that the company would not give plaintiff employment that possibly he could perform because "plaintiff wasn't honest with us."

The plan does not provide that an employee can be denied total disability benefits because the employee misrepresented his condition. It provides that if an employee is totally disabled he shall receive benefits unless the disability was caused by certain excluded causes which are not involved here.

If this had been an arbitration in which these two parties had selected a third, supposedly impartial, person to decide the controversy, the decision of the arbitrator might have to be affirmed even though we were of the opinion that the decision was not in accordance with the contract. *Brewer v. Allstate Insurance Co.*, 248 Or 558, 561-563, 436 P2d 547 (1968). We need

not decide whether that proposition is applicable here because the principle stated in the *Brewer* case should not be applicable when the party making the decision is one of the parties to the controversy.[1]

---

[1] Rueda v. Union Pacific Railroad Co., 180 Or 133, 175 P2d 778 (1946), assumed that a provision stating that a provision that the decision of one of the parties to the contract was final was a provision for arbitration. Assuming without deciding, that such a statement is correct, the *Rueda* decision is not contrary to this holding as we did not decide in *Rueda* what the effect was of a company decision contrary to the terms of the contract.