Argued and submitted July 3, 2007, affirmed on appeal and cross-appeal
January 30, 2008

Lawrence A. LAUDERDALE,
George B. Partridge, Robert H. Carter,
Tom Johnson, Melba E. Stephens,
Sheri Marie Lewis, and Ralph Hendrickson,
*Plaintiffs-Respondents,*
*Cross-Appellants,*

*v.*

EUGENE WATER AND ELECTRIC BOARD
and City of Eugene,
*Defendants-Appellants,*
*Cross-Respondents.*

Lane County Circuit Court
160320319; A128046

177 P3d 13

William F. Gary argued the cause for appellants - cross-respondents. With him on the opening brief were Susan D. Marmaduke, Caroline R. Guest, C. Robert Steringer, and Harrang Long Gary Rudnick P.C. With them on the reply brief was Sharon A. Rudnik.

Joel S. DeVore argued the cause for respondents - cross-appellants. On the opening brief were Martha L. Walters and Walters Chanti & Zennaché, P.C. On the reply brief were Joel S. DeVore and Luvaas Cobb.

Before Landau, Presiding Judge, and Schuman and Sercombe, Judges.

SCHUMAN, J.

**SCHUMAN, J.**

In 1990, 2003, and 2004, the Eugene Water and Electric Board (EWEB) increased the amount that it required its retired employees to contribute to the cost of their company-sponsored retiree health care benefits and that current employees would have to contribute for those benefits when they retired.[1] Shortly after the last increase, plaintiffs—five retired employees, the widow of a retired employee, and a then-current employee anticipating retirement—brought this action, alleging that the increase in cost amounted to a breach of contract and seeking specific performance of the original, pre-1990, agreement. The trial court agreed with plaintiffs that EWEB breached its contract and ordered EWEB to provide two of the plaintiffs with retirement health care benefits at the cost established in 1972 (that is, before any increase) and to provide the other plaintiffs with benefits at the cost established in 1990. EWEB appeals from the trial court's judgment on the ground that it never made an enforceable promise not to raise the cost of retiree health care benefits and that, in fact, it expressly reserved the right to do so. Plaintiffs cross-appeal, contending that the trial court should have ordered reestablishment of the 1972 costs for all of them, not just two. We affirm on appeal and cross-appeal.

The following facts are based on the trial court's express and implicit findings, which, we conclude, are supported by the evidence.[2] In 1956, EWEB began providing employees who had worked for the company for ten years or more with the same benefits after retirement that active employees received. Those benefits were offered at no cost for the retired employee and a nominal cost for dependents. In 1972, EWEB froze the cost of dependent coverage at $7.80 per month for dependents under age 65 and $3.00 per month

---

[1] EWEB is a public utility organized under the charter of the City of Eugene and vested with the city's authority to generate, collect, and distribute energy. The city and EWEB are both named defendants. We refer to them collectively as EWEB.

[2] Although plaintiffs sought both an interpretation of the contractual relations between themselves and EWEB and specific performance, the appeal deals only with the former. "Our standard of review is consequently highly deferential to the trial court's factual findings that bear on the question." *Stevens v. Foren*, 154 Or App 52, 59 n 5, 959 P2d 1008, *rev den*, 327 Or 554 (1998).

for dependents age 65 or over, maintaining free coverage for retired employees themselves. (For convenience, we refer henceforth to benefits at that cost as "1972 retiree health care benefits.") Beginning in 1975, EWEB abandoned the ten-year requirement and promised its employees that they would continue to receive the same coverage upon retirement that active employees received, at 1972 prices, regardless of years of service. EWEB used this promise to recruit and retain employees.

No significant changes occurred for 14 years. Then, in 1989, EWEB announced that it was planning to revise the retiree benefit plan and informed employees and retirees that it had the right to modify or terminate retiree health care benefits, notwithstanding the earlier assurances to the contrary. The announcement was not well received by employees or retirees. In response to that negative reaction, EWEB formed a benefit project team consisting of active employees and retirees to address the dispute and seek a solution. Although the retirees and employees expressed "strong preference for no changes in their current contribution rates," they were informed that "a 'no change' option would not be acceptable" to EWEB.

The new plan, drafted in consultation with the benefit project team, created three tiers of retirees. All three tiers' members continued to receive the same coverage as active employees; the new plan changed only the cost of that coverage. Tier I consisted of retirees who had turned 65 before January 1, 1990. Those retirees would continue to receive 1972 retiree health care benefits. Tier II consisted of retirees under age 65 on January 1, 1990, and employees who would retire between January 1, 1990 and December 31, 1993. In retirement, Tier II members would continue to receive health care benefits at no cost to themselves, but they would pay $29 per month, instead of $7.80 or $3.00, to cover their dependents. Tier III consisted of employees retiring after January 1, 1994. When they retired, they would pay between 100 percent and 25 percent of their health care premium based on the number of years they had worked for EWEB, until they reached 65, at which time they would be terminated from EWEB's benefit plan entirely. No EWEB employee legally challenged the 1990 modifications before this action was filed in 2004.

Plaintiff Lauderdale and plaintiff Stephens's husband retired from EWEB and turned 65 before 1990. Therefore, they were in Tier I and were not affected by the 1990 modification. Plaintiff Partridge retired before 1990, but did not turn 65 until after January 1, 1990, so he was in Tier II. Plaintiff Carter was also in Tier II because he retired in 1993. He made the decision to retire at that time in reliance on written documents issued by EWEB informing employees that they would be able to lock in the health care benefits given to Tier II retirees if they retired before 1994. Plaintiffs Johnson and Lewis retired after 1994, and plaintiff Hendrickson was still employed by EWEB at the time of trial, so all three were in Tier III. The following table may clarify the various tiers and plaintiffs' positions in them:

| Tier | Criteria for Membership | Plaintiff Members | Benefits under 1990 plan |
|---|---|---|---|
| I | Retired at age 65 or older before 1/1/1990 | Lauderdale (retired 1983) Stephens's (husband retired 1988) | Coverage equal to active employees; cost at 1972 level |
| II | Retired younger than 65 before 1/1/1990 OR retired between 1/1/1990 and 12/31/1993 | Carter (retired 1993) Partridge (retired 1982; not yet 65 on 1/1/1990) | Coverage equal to active employees; free for retiree; $29 per month for dependents |
| III | Retired after 1/1/1994 | Lewis (retired 2000) Johnson (retired 2003) Hendrickson (not yet retired) | Until age 65: coverage equal to active employees, cost linked to years of service; after 65 no coverage |

For approximately 13 years, EWEB implemented the 1990 plan and continued to provide employees with the retirement health care benefits that the plan established. During that period, Tier II and III plaintiffs paid the increased costs without protest (Tier I plaintiffs' costs did not increase under the 1990 plan). In 2003, however, and once again in 2004, EWEB made changes to the retiree health care plan that either significantly increased the cost to retirees

(including Tier I) or, also contrary to alleged earlier promises, did not provide the same coverage that active employees received.[3] In response to these changes, plaintiffs initiated this action seeking a declaration that EWEB had breached its contract with plaintiffs; a judgment requiring EWEB specifically to perform its contract obligations; an injunction requiring EWEB to provide retiree health care benefits equal to the benefits received by its active employees at the cost promised to plaintiffs prior to 1990; and damages based on the charges EWEB imposed on plaintiffs for their health care benefits in excess of the amount that plaintiffs should have been required to pay under EWEB's original promise.

EWEB, in response, argued that it never promised plaintiffs that they would receive 1972 retiree health care benefits identical in coverage to active employees'; that, to the extent that such promises were made, they were not made by anybody with authority to do so; and that the statute of frauds rendered them unenforceable in any event. Further, EWEB contended, they were also unenforceable because they were negated by EWEB's written reservation of rights to modify or revoke retiree benefits. Therefore, according to EWEB, the increases in 1990 and thereafter did not breach any contract. Further, even if the 1990 modification breached a contract, nonetheless, as to plaintiffs who had continued working after the 1990 modification or, if retired, had accepted the modification by paying the new premiums, any claims that those plaintiffs had to benefits promised before that time were extinguished because the 1990 modification constituted an accord and satisfaction.

EWEB filed a motion for judgment of dismissal pursuant to ORCP 54 B(2) at the close of plaintiffs' evidence and

---

[3] The 2003 change increased the premiums for retirees in Tiers I and II. Then in 2004, EWEB stopped covering all retirees who were 65 years of age or older and therefore eligible for Medicare. Those retirees were eligible for benefits under the Public Employee Retirement System (PERS), but the PERS benefits did not include dental, vision, or prescription coverage, all of which were still available to active employees. EWEB also discontinued dental coverage for all retirees and discontinued vision coverage for Tier III retirees even though active employees still received those benefits. In addition, retirees were notified that, beginning in 2004, premiums for Tier I retirees might increase annually and premiums for Tiers II and III retirees would increase annually in relation to the overall increases incurred by the insurance plan.

a motion for directed verdict pursuant to ORCP 60 at the close of all evidence. The trial court denied both motions. Instead, the court ruled that, before 1990, EWEB repeatedly promised to provide plaintiffs with lifetime 1972 retiree health care benefits that were equal in coverage to active employees'; that the statute of frauds did not render the promises unenforceable; that the promises were made by EWEB employees with authority to do so and approved by the EWEB board; that plaintiffs accepted the promised benefit package and acquired a vested right to it when they began or continued working for EWEB; and that, in the time between the inauguration of the benefit plan and 1990, EWEB did not make any "direct, affirmative, or meaningful representation" to employees or retirees that it could change retiree health care coverage costs.[4]

The court also concluded that, after EWEB announced its intention to change the cost of retiree health care benefits and (in 1990) did so, all of the plaintiffs who continued to pay the newly established costs (that is, Tier II and III plaintiffs) signaled acceptance of the new plan. As to those employees, however, the subsequent increases that EWEB implemented *after* 1990 breached the 1990 contract, because, the court found, that contract promised that the 1990 changes were a "one time" modification. The court also concluded that Tier I plaintiffs, whose payments for retiree health care benefits remained fixed at the 1972 level even after the 1990 modifications, could not be said to have participated in an accord and satisfaction. As to those plaintiffs, the 1990 modification was a breach of contract dating from the 1975 promise to freeze costs. Thus, in summary, the court ruled that Tier I retirees had a meritorious claim to health care benefits at 1972 costs, and Tier II and III retirees and employees had a meritorious claim to health care benefits at the costs established by the 1990 agreement.

---

[4] The trial court also concluded that plaintiffs' claims were not barred by the six-year statute of limitations on contract claims because each month that plaintiffs have to pay a higher premium for their health care benefits, a new claim accrues. *See Alderson v. State of Oregon*, 105 Or App 574, 579-80, 806 P2d 142 (1991). The trial court did limit damages to those that had occurred within six years before this action was filed. On appeal, the parties do not challenge the trial court's ruling on the statute of limitations, and we do not address it.

On appeal, the parties appear to agree on two important premises. First, they agree that, under Oregon statutory and case law, an employer cannot unilaterally modify an employee's or retiree's vested rights in benefits. They disagree about when (or whether) the retiree health care benefits in this case became vested. Second, they agree that, some time before 1989, EWEB promised orally and in writing that, upon retirement, plaintiffs and their dependents would receive 1972 retiree health care benefits that were identical in coverage to the benefits received by active employees. Although EWEB contested this fact at trial, the court expressly found it.[5] That finding is supported by uncontradicted evidence in the record, and EWEB does not renew its argument against it on appeal. Rather, EWEB argues that, for various reasons, the promises were unenforceable or superseded by its reservation of the right to modify or eliminate the benefit plan.

EWEB's principal argument on appeal, in other words, is that the oral and written promises to plaintiffs did not confer permanent vested rights to any retirement health care benefits. That is so, they maintain, for several reasons. First, the promises were either oral or, where written, not subscribed; therefore, evidence of the agreements was inadmissible and the agreements are unenforceable under the statute of frauds. Second, no agreements or promises were made or ratified by any person with actual or apparent authority to do so. Third, any promises regarding unchangeable retiree health care benefits that were made contradicted EWEB's express reservation of rights; those reservations amounted to a fully integrated term of the agreement between plaintiffs and EWEB and therefore could not be varied or nullified by extrinsic evidence of a different agreement. Fourth, although the trial court correctly ruled that the 1990 contract replaced any earlier agreement under the theory of accord and satisfaction, the court erred in ruling that the 1990 contract's "one time only" promise was admissible and enforceable so as to nullify subsequent modifications.

---

[5] "The first question * * * is whether there was an 'agreement' as alleged in the complaint to provide retiree medical benefits. There is virtually no evidence meaningfully contesting this issue. The Court finds that such benefits were offered to employees in various forms since 1956 forward."

Plaintiffs, for their part, generally echo the trial court's findings and conclusions.

■    We begin with EWEB's argument that the statute of frauds renders its promises unenforceable. Under Oregon's statutory version of that common-law rule, "[a]n agreement that by its terms is not to be performed within a year from the making" is

> "void unless it, or some note or memorandum thereof, expressing the consideration, is in writing and subscribed by the party to be charged, or by the lawfully authorized agent of the party; evidence, therefore, of the agreement shall not be received other than the writing, or secondary evidence of its contents[.]"

ORS 41.580(1), (1)(a). We agree with the trial court and EWEB that the 1972 retiree health care benefit agreement could not be performed within one year; under EWEB's retirement policies, plaintiffs were not eligible for any retirement benefits until after one year of employment. That policy relieved EWEB from performing during the first year. However, we have held that ORS 41.580(1) does not apply when *either* party has fully performed within one year. *Kneeland v. Shroyer*, 214 Or 67, 82-88, 328 P2d 753 (1958). And we have also held that, for purposes of the statute of frauds, when an employer offers pension benefits, the person to whom the benefits are offered completely performs his or her part of the agreement when he or she accepts the employer's job offer. *Kantor v. Boise Cascade Corp.*, 75 Or App 698, 704-05, 708 P2d 356 (1985), *rev den*, 300 Or 506 (1986). Thus, EWEB's argument based on the statute of frauds fails because, for purposes of that rule, plaintiffs fully performed the agreement by accepting employment.

■■    EWEB's argument based on lack of authority fails as well. Preliminarily, the argument appears to depend on the premise that no EWEB manager was authorized to contradict EWEB's reservation of the right to unilaterally change the cost of its benefit plan.[6] Because we conclude below that

---

[6] EWEB argues, "There was no evidence that the EWEB board actually authorized EWEB employees to relinquish EWEB's right to reduce or terminate benefits. * * * Plaintiffs likewise failed to prove that anyone other than the board had apparent authority to give up EWEB's right to reduce or terminate the benefits."

EWEB never effectively reserved that right, its argument fails to the extent that it is interwoven with the reservation of rights contention. To the extent that defendants make an independent argument that the EWEB board never authorized the pre-1990 policy, that argument fails as well. Plaintiffs' Exhibits 1 and 2, fact sheets entitled "Retirement Benefits" and distributed to plaintiffs, describe retiree health care benefits as being free to retirees and $7.80 or $3.00 per month for dependents. The trial court found as fact that the EWEB board approved those documents, and that finding is supported by the testimony of witnesses.

We therefore conclude that, before 1990, EWEB promised its employees that they would receive lifetime free or low-cost retirement health care benefits, and that the promise survives attacks based on the statute of frauds and on the theory that the promises came from EWEB employees without authority to make them.

■ EWEB, however, argues that, even if those findings and conclusions are correct, plaintiffs nonetheless cannot prevail, because Oregon law permits an employer to prospectively modify or eliminate benefits, that is, to modify or eliminate benefits the rights to which have not vested. Plaintiffs, however, assert that their entitlement to 1972 retiree health care benefits vested when, having been offered those benefits, they began working for EWEB, particularly in light of the fact that EWEB induced them to accept employment by promising them those benefits.

Plaintiffs are correct. By 1966 at the latest, the Supreme Court had rejected the "gratuity" theory of retirement benefits (that is, that employers can modify or eliminate benefits at will) and held that, when a person begins or continues employment having been promised a retirement benefit, or even if only having been "advised that he would receive" such a benefit, that benefit vests and cannot be modified or revoked. *Harryman v. Roseburg Fire Dist.*, 244 Or 631, 634, 420 P2d 51 (1966) (accumulated allowance for unused sick leave); *accord Oregon State Police Officers' Assn. v. State of Oregon*, 323 Or 356, 377-78, 918 P2d 765 (1996) ("Once the employee performs services in reliance on the

employer's promise to afford a particular benefit on retirement, the employer is contractually bound to honor that obligation."). The court in some cases regards the employee's act of beginning work as consideration for the employer's promise of benefits, *e.g., McHorse v. Portland General Elec.*, 268 Or 323, 331, 521 P2d 315 (1974); in other cases, the court regards the employee's commencement of work as an adequate tender of part performance in response to an employer's offer, *e.g., Taylor v. Mult. Dep. Sher. Ret. Bd.*, 265 Or 445, 452-53, 510 P2d 339 (1973).[7] Under these cases, then, plaintiffs' right to 1972 retiree health care benefits vested when they began working for EWEB; EWEB's modifications were of existing, vested rights and were not, therefore, prospective. *Accord Adams v. Schrunk*, 6 Or App 580, 583-85, 488 P2d 831 (1971) (pension; rejecting "gratuity" theory in favor of "vested right" theory); *Horton v. Prepared Media Laboratory, Inc.*, 165 Or App 357, 363, 997 P2d 864, *rev den*, 331 Or 283 (2000) (severance pay); *Furrer v. Southwestern Oregon Community College*, 196 Or App 374, 379-81, 103 P3d 118 (2004) (early retirement benefits).

*Brett v. City of Eugene*, 130 Or App 53, 880 P2d 937 (1994), *rev den*, 320 Or 507 (1995), does not help EWEB. That case involved accumulated leave time. When the plaintiffs began working for the city, it had a policy allowing employees to accumulate unused leave time and, on retirement, collect compensation for that time in a lump sum. The sum would be added to their last paycheck, thereby increasing the "final three-year average salary upon which their retirement benefits would be calculated, thereby increasing their potential monthly * * * retirement benefits[.]" During the period of the plaintiffs' employment, the city modified the policy by imposing a cap on the amount of leave time that could be accumulated. However,

---

[7] Indeed, in *Taylor*, 265 Or at 452, the court held that the employee's right to retirement benefits vested even without the employee's reliance on the employer's promise. The employer's adoption of a pension plan was an offer for a unilateral contract, which the employee accepted by partial performance when the employee "tendered the required contributions" from wages, even though the employee "did not undertake employment * * * with the expectation that she would be entitled" to the benefits and did not "continue her employment * * * upon the expectation that she would receive the advantageous pension authorized" by the employer.

"[t]he caps operate only prospectively. Employees with compensatory time balances *in excess of* the 80-hour cap will not lose those hours * * *. However, no new hours can be added to the balance. Employees at or above the compensatory time cap must take all future overtime in pay or in time off during the pay period in which it is accumulated."

*Id.* When the defendant announced the modification, the plaintiffs brought an action alleging breach of contract. They argued that "the *right to accrue unlimited leave* is analogous to a pension benefit and may not be modified." *Id.* at 58 (emphasis in original). This court concluded that, even if the right to accrue unlimited leave was a term of the employment contract, the defendant nonetheless could "modify [it] prospectively in the absence of an agreement to the contrary." *Id.* We held:

"It is conceded that defendant could not take away any already accumulated leave or the right to receive payment for it in the last paycheck. Those benefits are protected, vested property interests that may not be unilaterally modified or terminated. *Hughes v. State of Oregon*, 314 Or 1, 838 P2d 1018 (1992). However, the focus of this litigation is on *unaccumulated* leave. Plaintiffs contend that the right to continue to accrue leave in the future is a vested pension benefit. It is not. Unlike a pension benefit, the right to accrue leave in the future is not deferred compensation. *See Hughes v. State of Oregon, supra.* It is not even compensation. It is simply an option given employees with respect to the use of a part of their compensation. The court did not err in granting judgment to defendant."

*Id.* at 58-59 (emphasis in original).

*Brett* and the present case are distinguishable for several independently significant reasons. First, the focus in *Brett* was on "unaccumulated leave," that is, on benefits that served as compensation for unused leave time that had not been earned at the time of modification. Here, the focus is on benefits that came into existence *in toto* at the time plaintiffs began working for defendant. *Taylor*, 265 Or 445. Put another way: A plaintiff in *Brett* would accumulate more benefits the longer he or she worked before retirement, and the modification would affect only those benefits that had not yet been earned. Here, a plaintiff who worked for EWEB for one

year before retirement would be entitled to the same bene-fit—1972 retiree health care benefits—as a plaintiff who worked for 20 years before retirement; the modifications affect benefits that are already "earned." Second, the parties here, unlike those in *Brett, did* have an agreement that employer would not modify or eliminate the disputed bene-fits. That agreement triggered the vesting of plaintiffs' rights. *Taylor*, 265 Or at 450. And third, the right of plaintiffs to 1972 retiree health care benefits is *not* a mere "option given to employees with respect to the use of a part of their compensation"; it is, in fact, a form of "deferred compensa-tion." Just as health care benefits are part of an active employee's compensation package, retiree health care bene-fits are part of a retired employee's compensation.[8]

EWEB also claims that its position gains support from *Fish v. Trans-Box Systems, Inc.*, 140 Or App 255, 914 P2d 1107 (1996). In that case, the plaintiff accepted employ-ment from the defendant under a contract providing that, after 90 days on the job, he would be entitled to health care benefits and sick pay. After that period had elapsed, the plaintiff was injured and sought the benefits, only to learn that, in the interim, the defendant had modified the terms of employment so as to eliminate the benefits. The plaintiff con-tinued to work for the defendant nonetheless, despite learn-ing of the modified terms. *Id.* at 257-58. In denying the plain-tiff's breach of contract claim, we held that, absent a contrary agreement, an employer may "modify the employment con-tract so long as the modification applies only prospectively. An employee impliedly accepts such modifications by contin-uing employment after the modification." *Id.* at 259 (quoting *Albrant v. Sterling Furniture Co.*, 85 Or App 272, 275, 736 P2d 201, *rev den*, 304 Or 55 (1987)). EWEB argues that, as did the plaintiff in *Fish*, plaintiffs here impliedly accepted the modification.

We disagree. *Fish* is not on point. Its holding follows from the premise that the employment contract contained no

---

[8] To the extent, if any, that *Brett* implies that an employer can unilaterally modify or revoke retirement benefits that were part of an employee's benefit pack-age when the employee began or continued working for the employer, the case can-not be reconciled with *Taylor* or with the subsequently decided *Horton*, and we dis-avow such implication.

agreement that the employer would *not* modify the relevant contract term. In the present case, as we have decided, there is such an agreement. That agreement is the basis for our conclusion that plaintiffs' rights vested at the start of their employment and that the modification was therefore *not* prospective. Further, *Fish*, like *Brett*, deals with benefits that an employee receives on a day-to-day basis during employment, not after retirement; retirement benefits, as we have discussed, generally vest at the commencement of employment. That difference is crucial. An employer's ability to change an at-will employee's current compensation cannot meaningfully be compared to an employer's ability to change vested post-employment benefits.

EWEB, then, did not have the authority under Oregon law unilaterally to modify plaintiffs' benefits, because plaintiffs' rights to those benefits vested when EWEB offered them as an inducement and plaintiffs accepted them by partial performance; the modification was of a vested right and it was not prospective. That conclusion does not end our inquiry, however, because EWEB contends that it reserved the right unilaterally to modify or eliminate the retirement benefits and that this reservation superseded or qualified its promise to provide them.

We rejected a similar claim in *Horton*. In that case, the plaintiff began working for the defendant in 1979. In 1993, the defendant adopted a policy under which the plaintiff was promised that, if she were laid off after three further years of employment, she would receive either three months' notice or three months of severance pay. 165 Or App at 359. The written policy contained the following proviso: "[The defendant] reserves the right to alter, reduce, or eliminate any pay practice, policy, or benefit without notice **except for those provisions required by law**." *Id.* (boldface in original). The plaintiff continued working for the defendant for three years and was then laid off with one day's notice. We held that

> "defendant employer offered a benefit to its employees in exchange for their continued work. It was, in effect, a contractual term of the employees' continued employment.

Plaintiff in fact continued her employment, thereby precluding defendant from revoking any benefits that had been accrued to the point of revocation. * * * Defendant certainly retained the right to revoke its severance policy, but as in *Harryman, Taylor*, and *McHorse*, that revocation cannot substantially impair plaintiff's entitlement to benefits to which she already had become entitled."

*Id.* at 363. Under *Horton*, then, even if EWEB reserved its right to modify or eliminate its retiree health care benefits, that revocation could not be applied against any employee—including plaintiffs—who had acquired a vested right to them.

We therefore affirm the trial court insofar as it ruled that EWEB offered retiree health care benefits to plaintiffs at the 1972 level; that, by commencing or continuing work for EWEB, plaintiffs accepted EWEB's offer, formed a contract, and acquired a vested right to the benefits; and that EWEB's unilateral increase in retiree costs in 1990 was a breach of that contract. Those conclusions resolve the dispute between EWEB and Tier I plaintiffs. The dispute involving Tier II and III plaintiffs, however, requires additional attention. That is because the court ruled that those plaintiffs, unlike Tier I plaintiffs, accepted the 1990 retiree health care plan as an accord and satisfaction by continuing to work for EWEB (or, in the case of plaintiff Carter, by continuing to pay the increased cost) after 1990.[9] Plaintiffs, in their cross-appeal, argue that there was no accord and satisfaction. For the following reasons, we reject that argument.

"An accord and satisfaction is a type of executed, substituted contract, which extinguishes a previous obligation. It is an affirmative defense to the original obligation with the burden of proving all its elements resting upon the one seeking to invoke its effect." *Lenchitsky v. H. J. Sandberg Co.*, 217 Or 483, 490, 343 P2d 523 (1959) (citations omitted). That burden requires the party to establish

"that what is given or agreed to be performed shall be offered as a satisfaction and extinction of the original

---

[9] Tier I retirees were not affected by the 1990 or subsequent modifications; under the plan offered in 1990, Tier I retirees continued to pay 1972 rates for retiree health care.

demand; *that the debtor shall intend it as a satisfaction of such obligation, and that such intention shall be made known to the creditor in some unmistakable manner*. It is equally essential that the creditor shall have accepted it with the intention that it should operate as a satisfaction. Both the giving and the acceptance in satisfaction are essential elements, and if they [are] lacking there can be no accord and satisfaction."

*Id.* (quoting 1 CJ 529, Accord and Satisfaction § 16 (emphasis in original)). In the context of an employment dispute, "a substitute agreement may be used to resolve good faith disputes between an employer and employee over the amount of commission, overtime, salary, or other compensation." *Erickson v. American Golf Corp.*, 194 Or App 672, 681, 96 P3d 843 (2004). Whether an accord and satisfaction exists depends on the intent of the parties as "determined from all the circumstances attending the transaction." *Lenchitsky*, 217 Or at 490 (quoting 1 CJ 529, Accord and Satisfaction § 16). That intent is a question of fact, and our scope of review is narrow: we cannot set aside the trial court's finding if it is supported by the evidence, including reasonable inferences drawn from it, viewed in the light most favorable to the party that prevailed on the issue at trial. *Williams v. Leatham*, 55 Or App 204, 207, 637 P2d 1296 (1981) (quoting *Schlatter v. Willson*, 270 Or 685, 688, 528 P2d 1349 (1974), and *White v. Bello*, 276 Or 931, 933, 556 P2d 1362 (1976)). When the record is unclear, whether an accord and satisfaction has been formed should be resolved by the factfinder. *Lenchitsky*, 217 Or at 493.

Thus, because EWEB prevailed on this issue at trial, the precise question on cross-appeal is this: Does the evidence, including circumstantial evidence and reasonable inferences, viewed in the light most favorable to EWEB, support the findings that (1) EWEB and plaintiffs had a good faith dispute over whether EWEB could modify the cost of retiree health care benefits; (2) the circumstances demonstrate that EWEB unmistakably communicated to plaintiffs that the resolution of that dispute—that is, the three-tier 1990 contract—was offered as a substitute for the existing, 1972 retiree health care benefit; and (3) plaintiffs accepted the offer?

The trial court ruled that EWEB and its employees negotiated the 1990 contract in good faith; that the new contract effected a compromise, giving employees (including plaintiffs) part, but not all, of what they sought; that EWEB's intention to replace the 1972 retiree health care benefits with the new contract was unmistakably communicated; and that Tier II and III plaintiffs' acceptance of the new contract was established by the fact that they continued to work for EWEB or continued to pay the increased retiree costs and did not legally challenge the new contract for 13 years. In their cross-appeal, plaintiffs contend that, because EWEB never acknowledged that plaintiffs' entitlement to 1972 retiree health care had vested and told employees that "no change" was not an option, a good faith dispute never existed. They also argue that there is no evidence in the record that EWEB unmistakably communicated to plaintiffs that the new contract extinguished the old one, and that, therefore, plaintiffs never accepted that proposition.

Although the question is close, we reject plaintiffs' arguments and affirm the trial court on cross-appeal.

■ The parties had a good faith dispute over the cost to retirees of their health care benefits. Plaintiffs' argument to the contrary relies on *Lenchitsky*. In that case, the plaintiff claimed that the defendant, his former employer, owed him money for unpaid compensation. 217 Or at 485. The defendant offered to pay less than the plaintiff claimed, informing him that the amount offered "was all that [he] was going to get." *Id.* at 491 (internal quotation marks omitted). The Supreme Court held that, in those circumstances, a jury could find that the employer's offer "was merely an arbitrary declaration of intent on the part of the company to refuse to pay more on plaintiff's claim than it had previously determined to pay." *Id.* According to plaintiffs, that holding established that no good faith dispute can exist when one party had no intent to negotiate—and that is what happened here, because EWEB told its employees that the "no change" position was flatly unacceptable.

We disagree with plaintiffs for several reasons. First, *Lenchitsky* simply does not address the question whether the parties had a good faith dispute; the issue in the

case was whether the defendant's proffer of less than the amount claimed by the plaintiff was unmistakeably intended to substitute for that amount. Second, plaintiffs' argument does not account for the procedural posture of *Lenchitsky*. The defendant there assigned error to the trial court's denial of its motion for a directed verdict on the accord and satisfaction defense; the Supreme Court merely held that, because of the defendant's rigid posture, a jury "might well find" that there was no accord and satisfaction. *Id.* at 491. That holding does not compel the conclusion sought by plaintiffs: that an employer's rigidity or stubbornness *as a matter of law* establishes that there was no accord and satisfaction. It is merely one fact that can be considered by the factfinder. Here, EWEB negotiated with its employees from the position that it could increase the cost of retiree health care at will. The employees held the position that no increase was permitted. A compromise ensued. From those facts, a factfinder could reasonably conclude that the parties had a good faith dispute over retiree health care costs, even if EWEB's position was inflexible.

Plaintiffs are on somewhat firmer ground in arguing that EWEB never made "unmistakeably clear" its intention to substitute the 1990 costs for the 1972 costs. No document so states and no witness so testified. Indeed, EWEB's general manager testified that he never told any EWEB employees that, by accepting the new plan, they were relinquishing their claim under the old one. However, we must consider circumstantial as well as direct evidence, we must view that evidence and reasonable inferences that may be drawn from it in the light most favorable to EWEB, and, "[w]here the negotiations surrounding an alleged accord and satisfaction are doubtful and permit of conflicting deductions," we must defer to the factfinder's deduction. *Id.* at 493. Under that "narrow" scope of review, *Williams*, 55 Or App at 207, the trial court's ruling must stand. As noted above, EWEB and its employees had a dispute over retiree health care costs; they negotiated, and a new plan emerged from the negotiations. Plaintiffs then continued to work for EWEB or to pay the newly established costs and, for 13 years—until EWEB proposed another revision—they did not renew their claim to 1972 costs. From those undisputed facts alone, a factfinder could reasonably

infer that EWEB unmistakeably indicated to plaintiffs, and plaintiffs understood, that the 1990 plan substituted for, and extinguished their claim under, the existing plan. Indeed, a contrary inference—that plaintiffs believed EWEB's 1990 plan to be only a partial accommodation to their claim to permanent 1972 costs, with complete capitulation still possible in the future—is implausible. We therefore conclude that the trial court's finding of an accord and satisfaction is not error.

■     We also conclude, however, that the substituted contract that EWEB offered and that plaintiffs accepted did not include authorization for EWEB to make any further modifications. The trial court found that EWEB's communication regarding the 1990 changes announced a "one time change." More specifically, the court found:

> "EWEB told plaintiffs in writing and verbally that the changes set forth on [communication to employees and retirees] were one time changes and the amounts they would be charged for retiree health coverage for themselves and their dependents were fixed for life at the time of their retirement * * *.

> "EWEB did not provide employees with other written communications describing these changes."

Those findings are supported by undisputed evidence. After EWEB notified employees that it was contemplating changes in retiree health care costs, but before the 1990 plan was finally adopted, EWEB distributed material explaining,

> "The new $29 amount is intended to be a <u>one time only</u> change and would remain fixed for as long as the dependent(s) remain on the plan—including after the age of 65. * * *

> "* * * * *

> "As you can see, there is only one change proposed in retiree health insurance contribution. That change, which would be effective January 1, 1990, is a <u>one-time increase</u> to cover dependents of retirees under 65."

(Underscoring in original.) EWEB's board ultimately did not accept the "one time only" concept; instead, it passed a resolution stating that, with respect to Tier II and III employees,

"The Board reserves the right to amend or terminate these policies." Thereafter, the board sent employees information about the new plan; those summaries promised a "fixed" contribution for retiree's dependent coverage, and they did not mention the board resolution purporting to reserve the right to amend or terminate.

Thus, when plaintiffs continued working for EWEB and paying the increased contributions to retiree health care benefit costs between 1990 and 2003, they plausibly did so with the understanding that the increases would not themselves be increased in the future; they were "one time" increases. The trial court could reasonably conclude, in other words, that the accord and satisfaction did not include any reservation of EWEB's right to implement further increases and that the 2003 and 2004 increases therefore breached the 1990 contract.

To summarize: In the years before 1990, EWEB offered plaintiffs retiree health care benefits at no cost to themselves, $7.80 per month for their dependents under 65, and $3.00 per month for dependents over 65. By commencing or continuing work for EWEB while that offer was in effect, plaintiffs accepted it, formed a contract with EWEB, and acquired a vested right to the benefits. Even if EWEB could reserve the right to modify vested rights, it never effectively did so. Thus, EWEB's unilateral increase in retiree cost in 1990 was a breach of its employment contract with plaintiffs. However, by continuing to work for EWEB or paying the increased cost without legal challenge, Tier II and Tier III plaintiffs accepted the 1990 contract as an accord and satisfaction substituting a new contract for the earlier one. That new contract, however, provided only that EWEB could implement a one-time increase; it did not authorize the increases in 2003 and 2004.

Affirmed on appeal and cross-appeal.